## Selke et al. v. Stewart et al.

(Decided June 21, 1935.)

HENRY J. TILFORD and WILLIAM J. GOODWIN for appellants.

GORDON, LAURENT & OGDEN for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

For some years prior to January 2, 1929, J. F. William Selke and Lydia Selke, husband and wife, owned all the capital stock of the Atlas Plaster & Fuel Company, a corporation, hereinafter referred to as the fuel company, except a few of the shares issued to another person in order to comply with the requirements of the corporation laws. Mr. Selke was in active management of the business of the corporation, but Mrs. Selke devoted much of her time and energy to the promotion of the business, and rendered very material assistance in the way of soliciting business, etc. That they were people of unusual industry and business capacity is evidenced by financial statements and income tax returns made by the corporation.

H. J. Dorenkamp is a public accountant, and from 1922 to 1929 operated a public accounting business under the firm name of Turner-Spencer & Co. In 1929 he sold the accounting business but remained in the employment of the firm. In the latter part of June and December of each year, Dorenkamp made audits of the books of the fuel company. He also made its income tax reports. J. Adger Stewart has for many years been an active and successful business man, and has been connected with some corporate enterprises in the city of Louisville, and Dorenkamp made tax returns and audits for him or the concerns with which he was connected.

On January 2, 1929, Mr. Selke executed and delivered in duplicate to Dorenkamp the following agreement:

"I, J. Wm. Selke, President and owner of all capital stock of the Atlas Plaster & Fuel Company do hereby agree to sell the assets of the Atlas Plaster & Fuel Company to H. J. Dorenkamp and associates for $90,000.00, terms to be arranged. Said assets include all of the current assets and fixed investments as per statement of July 1st, 1928, compiled by Turner-Spencer & Company, and H. J. Dorenkamp associates will assume the notes payable and accounts payable due for purchases, credits due J. Wm. & Lydia Selke are not to be paid them, same being covered in the purchase price of $90,000.00.

"I, J. Wm. Selke, will turn over all the recipes and formulas on all other patents which the Company now holds in its possession as well as trade marks, etc. It is also understood that J. Wm. Selke will not venture into the same line of business in the city of Louisville."

The agreement was carried by Dorenkamp to J. Adger Stewart with whom he had been trying to negotiate a sale of the business and Mr. Stewart made the following indorsement thereon. "Accepted J. Adger Stewart, Louisville, Ky. Jan. 2, 1929." This was also signed by H. J. Dorenkamp and associates. Mr. Stewart testified that he had Mr. Dorenkamp sign it because the agreement was to sell to Dorenkamp and associates. Mr. Stewart made out a check of $5,000 payable to Mr. Selke, and this together with a copy of the agreement was delivered to Mr. Selke by Dorenkamp. On the following day Mr. Stewart delivered to Dorenkamp a check for $85,000 payable to Mr. Selke which was delivered to the latter, and he in turn delivered to Mr. Dorenkamp all the shares of the capital stock of the corporation assigned to Mr. Stewart.

On January 3, 20 shares of the stock of the fuel company were issued to J. Alexander Stewart, 20 shares to H. J. Dorenkamp, 3 shares to William A. Harris, 3 shares to J. D. Augustus, and 54 shares to J. Adger Stewart. Within a few days after the delivery of the certificates of stock to the purchasers, a new corporation known as the Atlas Plaster and Supply Company was formed which took over the business of the fuel company, and the latter corporation was dissolved.

On December 30, 1930, J. Adger Stewart, H. J. Dorenkamp, and the Atlas Plaster & Supply Company instituted this action against the Selkes. In their petition after setting out the foregoing facts relative to the contract of sale and the formation of the new corporation, etc., they alleged that by the terms of the contract, the assets purchased included among other things all current assets of the fuel company, and that the only liabilities which the purchaser agreed to assume were notes payable and accounts payable due for purchases.

In a second paragraph they in substance alleged that there appears on the books of the company an account against William A. Harris in the sum of $3,627.53; that the fuel company also had possession of a note for $600 dated October 3, 1928, signed by Thomas M. Farnsworth and payable to the order of William A. Harris; that this note had been negotiated by Harris to the fuel company; that the note appeared on the books as an asset of the fuel company, but that defendants knew the account against Harris and the note indorsed by him were not assets of the company; that at the time of the execution of the contract, the fuel company was indebted to William Harris in a substantial sum, but that this indebtedness was not shown in any manner on the books and records of the fuel company, but was known to defendants; that Harris instituted an action in the Jefferson circuit court seeking to recover judgment against the fuel company and the supply company for $5,280, the amount alleged to be due him by the former, subject to credit for $3,627.53, the amount charged to him on the books of the fuel company; that defendants were notified of the action and requested to defend it; that they refused to take over the entire defense but did employ counsel and assist in defending the action; that Harris recovered judgment for $652.47 and the court costs which plaintiffs were required to and did pay, the costs and expenses amounting to $74.45, and plaintiffs were also required to pay for legal services in defending the action the sum of $350. Because of these payments and the failure in assets as above indicated, plaintiffs prayed judgment, including interest, in the sum of $5,856.59.

In a third paragraph plaintiffs sought recovery of sums paid to the collector of internal revenue for as-

sessment of additional income taxes against the fuel company for the years 1923, 1925, and 1928, amounting altogether with interest to the sum of $4,784.16.

In a fourth paragraph it was alleged that the only liabilities of the fuel company which plaintiffs assumed and agreed to pay consisted of notes payable to the fuel company, which notes as shown by the statement of July 1, 1928, amounted to $3,500, and accounts payable due for purchases; that at the time the contract was made and immediately prior thereto, defendants represented to plaintiffs that the financial condition of the fuel company was as good as it was shown to be on July 1, 1928, by the financial statement; that at the time the contract of purchase was executed the amount of notes payable by the fuel company was $11,700 or $8,200 in excess of the amount shown by the statement of July 1, 1928; that these notes which were held by banks had been paid by plaintiffs; that on June 1, 1928, the Liberty Bank & Trust Company held notes executed by customers to the fuel company and discounted by it to the bank in a sum in excess of $20,000, and that this contingent liability of the fuel company was not shown on the statement of July 1, 1928; that on January 1, 1929, there were customers' notes discounted by the fuel company with the Liberty Bank & Trust Company in the total and principal sum of $13,-632.03; that no part of this was shown by the statement referred to in the agreement, nor was the existence of this liability disclosed by defendants to plaintiffs at the time the contract was executed; that plaintiffs had been required to and did pay to the bank the amount of these discounted notes and had been able to collect thereon only the sum of $7,176.67; that the amount of such notes which had been so paid by plaintiffs to the bank and which had not been and could not be collected from the customers or from any other source is $6,455.36.

In a fifth paragraph of the petition, plaintiffs alleged that prior to the execution of the contract defendants represented that all accounts receivable on the books of the fuel company, with the exception of the account of one Merriweather, were good and collectible; that the accounts receivable represented the largest and practically the only substantial current asset of the fuel company; that the total amount of

the accounts receivable as of January 1, 1929, which had been and were known by defendants to be bad and uncollectible and which could not be and had not been collected by plaintiffs since that time, with the exception of the Merriweather account, amounted with interest to $16,676.90.

They prayed for judgment for the sums of $5,-856.58, $4,784.16, $16,340.72, and $16,676.90, with interest from December 1, 1930, until paid.

Defendants, in addition to a general denial, also entered a plea of estoppel.

On final hearing the chancellor delivered a written opinion and adjudged that plaintiffs recover the sums as prayed for in paragraphs 2, 3, and 4 of the amended and substituted petition amounting with interest in the aggregate to $31,321.16 and their costs; that on satisfaction of the judgment the plaintiffs should deliver to defendants notes of customers which were discounted and which remained uncollected as set out in the petition. It was further adjudged that the claim of plaintiffs set up in the fifth paragraph of the amended and substituted petition be dismissed, and that they take nothing thereby. Defendants are appealing, and upon motion of plaintiffs they have been granted and are prosecuting a cross-appeal.

A number of grounds are argued and relied on by appellant for reversal, but as a matter of convenience we shall discuss them in a different order than that in which they appear in the brief. Each party is vigorously contending that in the transaction out of which the litigation grows Dorenkamp was acting as the agent for the other. While the evidence is not as clear as it might be concerning negotiations leading up to the written agreement, it is apparent from the evidence and from the natural inferences to be drawn therefrom that Dorenkamp discussed the transaction with both Stewart and Selke prior to the day on which the written proposal was made by the latter and accepted by the former. Mr. Stewart testified that Dorenkamp had spoken favorably of the business to him on several occasions. Mr. Selke testified that on the morning of January 2, 1929, Dorenkamp called him at his residence and stated that he wanted to come down. He gave the

following account as to what occurred when Dorenkamp arrived:

> "And he came down there and said 'I want to buy your business,' and I said: 'Mr. Dorenkamp, I don't know whether I want to sell,' and then he said: 'Well, I have got a buyer,' and I said: 'Well, I don't know whether I want to sell at all,' and then he said he had so many thousands of dollars to offer me for the business, and I said: 'Mr. Dorenkamp, that won't buy it,' and he said 'That is as much power as I have got. I will call you in a half an hour,' and I said: 'Add $20,000 and that may buy it.' * * * $70,000 was the first offer, and I said: 'Raise it to $90,000 and I may talk to you.' Then he left and called me in a half an hour said 'Will, it is sold,' and he brought me down $5,000."

He further stated that when Dorenkamp brought the check he also brought the agreement which was signed; that Dorenkamp afterward called him up and told him there was a certified check for $85,000 at the bank; that the first time he heard of the transaction was when Dorenkamp called him on the phone on January 2; that he had not employed Dorenkamp to sell the business or to represent him in the transaction. It appears in evidence that on the day following the execution of the contract, Mr. Selke lent Dorenkamp $25,000, taking his note with some stock in a corporation as collateral. Dorenkamp testified that Selke paid him $5,000 commission for making the sale. There is a credit of $5,000 on the note which shows that it was allowed as commission for making the sale. Mr. Selke denied that he paid the commission and explained the credit by saying that he learned that the note was worthless and the $5,000 was in the nature of a gift. Mr. Stewart testified that on January 1, he went to Mr. Dorenkamp's office on some tax matters and Dorenkamp suggested that the fuel company was a good money making business, and he thought Mr. Selke wanted to sell it and while he was in the office Dorenkamp called Selke on the phone at his residence. He could not tell what Selke was saying, but Dorenkamp discussed the accounts as to their being good or bad and reported to him that Selke said that with the exception of the Merriweather account amounting to between $9,000 and $10,000 they were good; that Dorenkamp offered Selke $50,000 for the business, but

reported to him that Selke refused that offer and expressed an opinion that it could be bought for $70,000; that on the following day Dorenkamp came to him with a written proposal, but he objected to features hereinafter discussed and Dorenkamp later returned with the agreement which he accepted and signed, and as a matter of precaution he had Dorenkamp sign it. While 20 shares of the capital stock were later issued to Dorenkamp, there is nothing to show on what account he acquired the stock. J. Alexander Stewart, who was treasurer of the fuel company after the transfer, and vice president and treasurer of the supply company after its organization, was the only witness asked concerning this matter, and he testified that he was ill at the time and did not know what the consideration was for the transfer of the stock to Dorenkamp.

The chancellor in a long and well-considered opinion went into careful analysis of every phase of the case and concluded that Dorenkamp was not the agent of either party but a go-between or mouthpiece for the parties, or as the chancellor expressed it, "a sort of ambulatory telephone" through which the purchaser and buyer negotiated the deal. However, in the course of the opinion it is said:

"If it were necessary to decide whose agent Dorenkamp was, then I think it would be necessary to say that he was Selke's agent."

From the foregoing and other facts and circumstances not recited, we adopt the view and the finding of the chancellor on this question.

It is further argued that it was meant and understood by the contract that appellees, for the consideration recited, sold the good will, current assets, and fixed investments of the fuel company as shown by the financial statement of July 1, 1928, and the purchaser assumed all note obligations of the company and accounts which it owed for merchandise, and that the contract of sale was sufficiently complete to exclude any attempted modification in the absence of the plea of fraud or mistake.

As pointed out by the chancellor, the contract on its face shows that it was not and could not be complete, since it provided that the terms were to be later agreed

upon. The fuel company was a going and active concern, and the parties necessarily knew and understood that the assets and liabilities would not be the same on the 1st of January, 1929, as they were shown to be by the audit of July 1, 1928. In the very nature of things, the assets and liabilities could not be the same except as to fixed assets. Then, why was it necessary and what was the purpose of the parties in inserting in the agreement any reference to the statement of July 1, 1928? Manifestly it was understood by the parties that the July audit was to have some effect in determining the rights and liabilities of the parties. In the interpretation of the contract, the chancellor concluded that its effect so far as the current assets of the company were concerned was to protect the purchaser against a decline in the book value below the amount shown on the statement of July 1, 1928, and that his liability for notes and accounts payable was to be limited by that statement. Viewing the contract in the light of all the circumstances and the situation of the parties, it is susceptible of no other reasonable construction.

It is further argued that the note obligations of the fuel company including its liability on account of notes discounted were shown on the books of the corporation to which appellees had access at the time of the sale and that Dorenkamp was one of the purchasers and bound by his knowledge and means of knowledge of the true financial conditions of the company which he and his associates had purchased. The evidence discloses that Dorenkamp was not the purchaser and Mr. Selke knew that he was not, and apart from this question, the evidence only shows that Dorenkamp made semiannual audits of the business; and the statement of July 1, 1928, does not disclose the matters about which appellees complain, and there is no evidence to show that Dorenkamp actually had knowledge of these matters.

Notwithstanding Dorenkamp's knowledge that claims for additional income taxes were pending and his knowledge concerning the status of the Harris accounts, appellants' plea of estoppel in the circumstances cannot be sustained.

Coming to the cross-appeal, we find appellees earnestly contending that the court erred in refusing the relief sought by paragraph 5 of the amended and substituted petition. Dorenkamp testified that prior to the

execution of the agreement, Selke stated that all of the accounts other than that of Merriweather were good and collectible, and that he reiterated this statement afterward. Mr. Stewart testified that this information was borne to him, and that when the first draft of the proposal was submitted to him he refused to accept it on the ground that it omitted the agreement of Selke not to again enter in the same line of business, and that it contained no warranty or representation that the accounts were good. Mr. Selke testified that he made no warranty of the accounts and that he did not state that they were all good and collectible; that he did possibly express an opinion that the accounts were good except the Merriweather account, and that he thought about 50 per cent. might be realized on that. Notwithstanding Mr. Stewart's claim that Mr. Selke had represented and warranted the accounts to be good and his statement that he refused to sign the proposal as first presented because it contained no guarantee or warranty of the accounts, the paper which he did sign contained nothing of this character.

The chancellor concludes from the evidence that Mr. Selke did make statements or representations concerning the soundness of the current assets, but that to warrant recovery on account of misrepresentations concerning the accounts it was necessary to show that the representations were false and made with a knowledge of their falsity, and with the intention that they be relied upon; that they were such representations, as in the circumstances, the complaining parties were justified in relying upon in the exercise of common prudence and diligence. In discussing the elements necessary to warrant a recovery, the chancellor concluded that any representations as to the soundness of the accounts except that of Merriweather were clearly false, but expressed a doubt whether Mr. Selke made such representations with the intent that they should be relied upon by the prospective purchaser; that Stewart no doubt did rely on the statements, and, if he did so, he thereby suffered a loss; but finally concluded that Mr. Stewart did not exercise ordinary prudence or diligence in the matter. He made no inquiry concerning the individual creditors or the amounts of their accounts and while he claimed to have refused to sign the contract because it contained no guarantee concerning the soundness of the accounts, he accepted the proposal without

anything in it concerning the soundness or collectibility of the accounts. This at least put him upon notice that if Mr. Selke had in fact made the representations as claimed by appellees, he was unwilling to make it a part of the written agreement. On this as on other questions in issue, the chancellor's finding is amply supported by the evidence, and should not be disturbed.

Wherefore, the judgment is affirmed on both the original and cross-appeals.