**Ivan WELLS, Plaintiff–Appellant,**

v.

**HUISH DETERGENTS, INC., Defendant–Appellee.**

No. 00–5203.

United States Court of Appeals, Sixth Circuit.

July 24, 2001.

---

Before KEITH, SILER, and CLAY, Circuit Judges.

## OPINION

DAMON J. KEITH, Circuit Judge.

Plaintiff-appellant Ivan Wells brought this employment action in state court against his former employer, defendant-appellee Huish Detergents, Inc. ("Huish" or the "Company"). Huish removed the case to federal court and subsequently filed a motion for summary judgment. The district court granted Huish's motion, and Wells appeals. Because we find no reversible error, we AFFIRM the district court's decision granting summary judgment.

## I. BACKGROUND

### A. Procedural History

Wells, a resident of Kentucky, originally filed his complaint in this employment action against Huish in Warren Circuit Court, in Warren, Kentucky.[1] Huish, a corporation organized in Utah, filed a notice of removal in the United States District Court for the Western District of Kentucky on April 18, 1998. The matter was removed to federal district court pursuant to 28 U.S.C. § 1441(a).

As the parties were completing discovery, Huish filed a motion for summary judgment on all of Wells's claims. In its motion, Huish asserted that Wells failed to produce the facts necessary to support any of his claims. On November 30, 1999, the district court entered a memorandum opinion and order granting Huish's motion. The district court concluded that there were no genuine issues of material fact as to any of Wells's claims. Subsequently, on December 7, 1999, Wells filed a motion pursuant to Fed.R.Civ.P. 59(e) to alter or amend the district court's summary judgment order. The district court denied Wells's motion in a memorandum opinion and order on February 3, 2000. On February 10, 2000, Wells filed a timely notice of appeal of the district court's order granting Huish's summary judgment motion and the district court's order denying his motion to alter or amend the summary judgment.[2]

### B. Factual Background

In early 1995, Wells applied for a position as a line mechanic in the maintenance

---

1. In his complaint in state court, Wells alleged claims of breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, employment discrimination in violation of Ky.Rev.Stat. Ann. §§ 344.040 and 207.150, and retaliatory dis-

charge in violation of Ky.Rev.Stat. Ann. § 342.197.

2. Wells did not appeal the district court's disposition of his employment discrimination claims under Ky.Rev.Stat. Ann. §§ 344.040 and 207.150.

department of Huish's plant in Bowling Green, Kentucky. Wells was subsequently hired and reported directly to John Hillenger, the maintenance manager, who in turn reported to Amir Mahdavi, the Bowling Green plant manager. At the beginning of his tenure at Huish, Wells attended an orientation session in which company personnel explained Huish's rules, policies, and procedures. Wells also received a Huish Policy Book (the "Handbook"). The Handbook contained Huish's employment policies at issue in this matter.

The introduction to the Handbook, § 1.00, summarizes Huish's at-will policy. It states:

This Handbook is not intended to be a contract of employment. The Company reserves the right to modify any provisions of the Handbook at any time.

Although we hope that your employment relationship with us will be mutually satisfactory and rewarding, the employment relationship is an "at-will" relationship. That means that either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice.

No supervisor, manager or other representative of [the Company]—other than the President—has the authority to make any agreement or promise of employment for any specified period, or to change the at-will status of employment. The President of [the Company], is authorized to make an employment agreement only if it is in writing.

(J.A. at 641).

In addition, § 6.007 of the Handbook, titled "AT–WILL EMPLOYMENT POLICY," describes the Company's at-will policy. It states, in pertinent part:

The Company intends that all employment be "at-will." This means that an employee may terminate his or her employment with the Company at any time and for any reason, without the necessity of giving any particular notice. Similarly, the Company may terminate the employment of any employee at any time without the necessity of giving any particular notice and for any reason that is not prohibited by law. Permanent employment or employment for a specified term cannot be guaranteed or promised.

No employee, supervisor, or management official is authorized to promise any employee permanent employment or employment for any agreed or specified term. No employee, supervisor, or management official is authorized to promise any employee that employment will be terminated (or that disciplinary action will be taken) only "for cause" or in accordance with any particular procedure.

No employee should assume or infer that any statement or promise purporting to limit the Company's right to terminate any employee is a statement or promise on behalf of the Company. Any such statement or promise should be taken as nothing more than an ill-advised and unauthorized act, contrary to Company policy. In no event will the Company be bound by any such statement or promise.

(J.A. at 673).

Finally, § 6.016, titled "GIFTS AND GRATUITIES," outlines the Company policy with respect to self-dealing transactions. This provision states, in pertinent part:

Employees are prohibited from having any personal financial dealing with any individual or business organization that furnishes merchandise, supplies, property or service to the Company. Employees are not permitted to conduct Company business with companies that have

relatives of the Huish employee, if the employee has approval authority over that area of business for Huish.

(J.A. at 677). Wells affirmed that he received the Handbook and understood its terms by signing a "Policy Book Acknowledgment" form.[3]

Wells's employment at the Bowling Green plant continued for almost three years. He received good work evaluations and Huish considered him to be an excellent employee. In January 1998, one month before his termination, Huish transferred Wells to a new position with increased responsibilities.[4]

While working at his new position, Wells asserts that sometime between January 18 and 20, 1998, he fell down a flight of stairs at work and severely injured his knee. Wells alleges that he fell in Hillenger's presence and that he reported the fall to Eric Woolsey, a Company employee, and a security employee named "Jane." Hillenger stated that he "heard a noise" and saw Wells standing on the stairs. According to Hillenger, Wells told him that he had slipped, but he was fine. Wells also believes that he reported the fall to Mahdavi and Ron Anglin, the powder packaging manager. Following the fall and related injury. Wells hobbled around work and continued in the performance of his duties.[5]

In February 1998, Hillenger learned that Wells owned an independent business that was selling items to Huish in violation of the self-dealing provisions of the Company Handbook. On February 9, 1998, Gary Holder, a supervisor, told Hillenger that an address for a company called P.A.C.E., listed on a purchase order signed by Wells's fiancee Paige Lindsey, looked familiar.[6] Holder determined that the ad-

---

3. The Huish Policy Book Acknowledgment form states, in pertinent part:

> I have received my copy of the [Company] [Handbook] which outlines the policies, practices and benefits of Huish Detergents, Inc. I accept responsibility for informing myself about these policies, either by reading them or by asking that they be explained to me.

> .     .     .     .     .

> All employees of the Company are employees "at-will" and, as such, are free to resign at any time without reason. The Company, likewise, retains the right to terminate an employee's employment at any time or without reason. Nothing contained in the [Handbook] (or any other document provided to the employee) is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time.

> .     .     .     .     .

> I understand and agree that no one in this Company has offered me employment or terms different from what is stated on this page; and I understand and agree that no one in the Company is authorized by the Company to promise me in the future that the terms of employment will be different from what is stated on this page.

(J.A. at 635).

4. Huish transferred Wells pursuant to § 2.003, "EMPLOYMENT OF RELATIVES," of the Handbook. Wells had become engaged to Paige Lindsey, a co-worker in the maintenance department. They have since married.

5. In March 1998, a month after his termination from Huish, Wells had knee surgery to address the injury.

6. The P.A.C.E. acronym stands for "Professional Automotive Care and Equipment." P.A.C.E. purchased tools and equipment at auction and would later attempt to resell the products for profit. Wells's fiancee requisitioned the items sold to the Company by P.A.C.E. Wells ran the business from the home the couple shared.

dress corresponded to the home where Wells and Lindsey resided. After telling Holder to keep the information private, Hillenger informed Mahdavi of the situation.

On February 11, 1998, Mahdavi, Hillenger, and Lisa Timberlake, the manager of human resources at the Bowling Green plant, met with Lindsey. Lindsey informed them that P.A.C.E. was a vendor of the Company. Although she claimed that she did not know that Wells owned P.A.C.E., Lindsey admitted that she had ordered items, through Wells, from P.A.C.E. Lindsey also stated that she received permission from Anglin before initiating the transactions with P.A.C.E. She further stated that Anglin knew that Wells was involved with P.A.C.E. because she had previously informed him.

Thereafter, Mahdavi, Hillenger, and Timberlake met with Wells. Wells admitted that he owned P.A.C.E. Wells claimed that Lindsey told him that Huish needed the items that P.A.C.E. supplied. Wells also stated that he told her "to make sure everything was all right ." Consistent with Lindsey's statements, Wells asserted that Anglin gave him permission to engage in self-dealing, and stated that it was "common practice" at Huish. Mahdavi then informed Wells that employee self-dealing with the company was a violation of Company policy, and that it was impermissible even if Wells had requested permission from him (Mahdavi) before engaging in the self-dealing transactions.

After the meeting, Huish suspended Wells and Lindsey. Mahdavi spoke to Hillenger and Anglin, and both stated that they were not familiar with P.A.C.E. and that they did not know that Wells was selling items to Huish. Anglin also denied giving Wells any authorization to engage in self-dealing transactions with the company. Thereafter, Mahdavi concluded that

although only Wells violated Company policy, both Wells and Lindsey conspired to keep the P.A.C.E. operation secret. After discussing the situation with the corporate human resources manager at Huish's headquarters in Salt Lake City, Utah, Mahdavi was given approval to terminate Wells and Lindsey. On February 13, 1998, Mahdavi terminated Wells and Lindsey.

## II. STANDARD OF REVIEW

"We generally review a denial of a motion to alter or amend the judgment under Rule 59(e) for abuse of discretion. However, when the Rule 59(e) motion seeks review of a grant of summary judgment, as in the case at bar, we apply a de novo standard of review." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 554 (6th Cir.1998) (en banc) (citations omitted).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, "the evidence, all facts, and any inferences that may be drawn from the facts must be reviewed in the light most favorable to the nonmoving party." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir.2000). "[T]he existence of a mere scintilla of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In this diversity case, we apply state substantive law in accordance with the controlling decisions of the Kentucky state courts. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Prestige Cas. Co. v. Mich. Mut. Ins. Co.,* 99 F.3d 1340, 1348 (6th Cir.1996).

## III.  DISCUSSION

### A.  Breach of Contract Claim

■ Wells argues that he had permission from an agent of Huish to engage in self-dealing transactions with the Company without any adverse employment consequences. Wells argues that this permission created an oral contract which allowed him to self-deal with the Company, and therefore modified his at-will employment status. Thus, Wells asserts that his termination for engaging in the self-dealing transactions constituted a breach of contract.

Wells argues that, because Anglin permitted him to engage in self-dealing without fear of termination, an oral agreement existed, and his termination was a breach of that agreement. In support of this argument, Wells directs this Court to *Hammond v. Heritage Communications, Inc.,* in which the Kentucky Court of Appeals held that an issue of fact existed, precluding summary judgment, as to whether an employee and employer entered into an oral contract modifying the employee's at-will employment status. 756 S.W.2d 152, 154 (Ky.App.1988). In *Hammond* an employee's immediate supervisor told her that she would not lose her job if she appeared nude in "Playboy" magazine. 756 S.W.2d at 154. After she appeared in the magazine, the company terminated her. *See id.* at 153. The *Hammond* court held that her uncontested allegation that she had permission to pose in the magazine without fear of termination created a factual issue for the jury, as to whether an oral contract existed that modified her at-will status. *Id.* at 154. Wells contends that, similar · to the employee in *Hammond,* he should be allowed to proceed to a jury regarding his breach of contract claim.

*Hammond* is distinguishable from the facts of the instant matter. In *Hammond* there was no evidence of a specific company policy that the employer would not be bound by unauthorized representations made by any employee. Here, it is uncontested that the Handbook states that the Company would not be bound by unauthorized statements by employees. Moreover, in *Hammond,* there was no evidence that the employer provided its employees with a handbook that specifically limited modifications of the employment relationship to a written statement from the company president, as we have in the instant matter. Finally, Wells signed the Huish Policy Acknowledgment form confirming that he understood the terms of his employment from the Handbook. Thus, we find Wells's reliance on *Hammond* misplaced.

Moreover, it is clear that Anglin lacked any authority to alter Wells's at-will employment status. Wells acknowledges that he read the Handbook and was aware that only Huish's president, in writing, has the authority to modify the at-will employment status of a Huish employee. Wells was aware that "no employee should assume or infer that any statement or promise purporting to limit the Company's right to terminate any employee is a statement or promise on behalf of the Company." (J.A. at 673). Wells understood these terms and signed the Huish Policy Acknowledgment form, which summarizes the at-will policy and states clearly that "no one in the Company is authorized by the Company to promise me in the future that the terms of employment will be different

from what is stated on this page." (J.A. at 635). Therefore, Wells was fully aware that only the president of Huish, not Anglin or any other manager, had the authority to bind the Company or modify his at-will employment status with the company.

■ Wells makes three other arguments in support of his breach of contract claim. First, Wells asserts that Huish violated its own Company policy regarding the termination of employees by failing to complete a request for employee termination. However, the Handbook states that employment will not be terminated "in accordance with any particular procedure." (J.A. at 673). Whether Huish failed to complete a request for employee termination is not relevant to this Court's determination of whether Wells has presented a genuine issue of material fact regarding his breach of contract claim.

■ Second, Wells asserts that Huish, in a Company directive titled "Your Legal Obligation to Outsiders," acknowledges that management officials could bind the Company through unauthorized statements. However, at the time that Anglin allegedly gave him permission to engage in self-dealing, Wells was not aware of the existence of the Company directive. Therefore, given the express terms of the Handbook, this directive cannot serve as the basis of Wells's objectively legitimate belief that Anglin had the authority to bind the Company. *See Hines v. Elf Atochem N. Am., Inc.,* 813 F.Supp. 550, 553 (W.D.Ky.1993) (holding that at-will contract may have been modified by posted company rules where employee could see the rules and employee read and relied on the rules).

■ Finally, Wells argues that Huish allowed other employees to violate the Company's rule prohibiting self-dealing arrangements, but did not terminate them. However, none of those employees engaged in self-dealing through the ownership and operation of an independent business that sold products directly to the Company, as Wells's business did. Irrespective of whether Wells or any other employee was engaged in self-dealing, he was an at-will employee and the Company could have terminated him for any reason.

In sum, Huish's Handbook provisions prevented any oral modification of Wells's at-will employment status. Wells was fully aware that Anglin did not possess the authority to bind the Company, and that he could not promise that Wells could engage in self-dealing without any adverse employment consequences. Accordingly, the district court did not err in granting summary judgment on Wells's breach of contract claim.

## B. *Fraudulent Misrepresentation Claim*

Wells asserts that Anglin made a material representation that he could engage in self-dealing and that there would not be adverse employment consequences. Wells argues that, since he relied on Anglin's material representation and Huish terminated him, he has a viable fraudulent misrepresentation claim against Huish.[7]

---

**7.** The district court did not address the fraudulent misrepresentation claim in its initial memorandum opinion or its summary judgment order of November 30, 1999. On February 3, 2000, in its memorandum opinion and order denying Wells's Rule 59(e) motion to alter or amend judgment, the district court addressed the fraudulent misrepresentation claim for the first time by stating that Wells did not plead fraudulent misrepresentation with particularity in his complaint as required by Fed. R. Civ. Pro. 9(b). Thus, the district court concluded that the fraudulent misrepresentation claim was not properly before it. The district court, however, still addressed the claim on the merits and concluded that no action existed against the Company because the Handbook states that no statement by any

■ In an action for fraud under Kentucky law, "the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999) (citing *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d 357, 359 (Ky.App.1978)). "[A] claimant may establish detrimental reliance in a fraud action when he acts or fails to act due to fraudulent misrepresentations." *Id.* at 469 (citing *Sanford Constr. Co. v. S & H Contractors, Inc.,* 443 S.W.2d 227, 232 (Ky.1969)). The claimant, however, can " 'secure no redress for a representation which he knew to be false nor for failure to disclose facts which he knew to exist.' " *Lincoln–Income Life Ins. Co. v. Kraus,* 279 Ky. 842, 132 S.W.2d 318, 320 (1939) (quoting 26 C.J.S. *Fraud* § 55). In addition, the claimant must be justified in relying upon the representations in the exercise of common prudence and diligence. *See Selke v. Stewart,* 260 Ky. 442, 86 S.W.2d 83, 87 (1935).

■ Assuming that the Company is liable for Anglin's statements, Wells has submitted sufficient evidence that he relied on a false material representation and suffered injury through his termination. However, Wells cannot establish that he was justified in relying on Anglin's permission in the exercise of common prudence and diligence. First, Wells knew that Anglin did not have the authority to make such a representation, as Huish's policies are clear that it would not be bound by unauthorized statements by employees. Second, Wells was aware that unauthorized

statements by employees, such as Anglin's representation, are "nothing more than ill-advised and unauthorized act[s], contrary to Company policy." (JA at 673). Third, Wells was aware that only the president of Huish can modify the at-will employment status of an employee, and that "no statement by any employee should be interpreted as altering the employment agreement." Therefore, Wells was not justified in relying upon Anglin's representation. Accordingly, the district court did not err in granting Huish's motion for summary judgment on Wells's fraudulent misrepresentation claim.

### C. Retaliatory Termination Claim

Wells asserts that Huish terminated him, in violation of Ky.Rev.Stat. Ann. § 342.197, because he intended to pursue a lawful workers' compensation claim on an injury that he suffered at work. Wells argues that his discharge constituted retaliatory termination for seeking a benefits claim.

Kentucky's retaliatory statute states that: "[n]o employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim." Ky.Rev. Stat. Ann. § 342.197(1). Despite the unambiguous terms of the statute, Kentucky law does not require that a party alleging retaliatory discharge file a formal claim so long as the party proves he "intended to file and pursue a lawful workers compensation claim." *First Prop. Mgmt. Corp. v. Zarebidaki,* 867 S.W.2d 185, 189 (Ky.1994); *see also Southerland v. Hardaway Mgmt. Co.,* 41 F.3d 250, 256 (6th Cir.1994).

■ Under Kentucky law, the plaintiff claiming retaliation must provide evidence

employee should be interpreted as altering the employment agreement. Since the district court concluded on the merits that no

fraudulent misrepresentation claim existed, we can proceed to review that conclusion.

that he (1) "engaged in a statutorily protected activity," (2) was discharged, and (3) "there was a connection between the protected activity and the discharge." *Willoughby v. GenCorp., Inc.*, 809 S.W.2d 858, 861 (Ky.App.1990); *accord Henderson v. Ardco, Inc.*, 247 F.3d 645, 654 (6th Cir. 2001). The employee must demonstrate that his pursuit of a lawful claim "was a substantial and motivating factor, but for which [the employee] would not have been discharged." *Zarebidaki*, 867 S.W.2d at 188; *see also Southerland*, 41 F.3d at 256.

■ Wells has failed to establish that his pursuit of a workers compensation claim "was a substantial and motivating factor" in Huish's decision to discharge him. The evidence clearly demonstrates that Wells would have been discharged regardless of his injury. Wells does not dispute that he violated Company policy, nor does he dispute that such conduct was grounds for termination. Accordingly, the district court did not err in granting the motion for summary judgment on Wells's retaliatory termination claim.

### D. Breach of the Covenant of Good Faith and Fair Dealing Claim

■ Kentucky law does not recognize a claim of breach of the covenant of good faith and fair dealing in the employment context. *See McCart v. Brown–Forman Corp.*, 713 F.Supp. 981, 983 (W.D.Ky.1988). The cases to which Wells directs this Court, *Ranier v. Mt. Sterling Nat. Bank*, 812 S.W.2d 154 (Ky.1991), and *City of Berea v. Wren*, 818 S.W.2d 274 (Ky.App.1991), recognize the covenant of good faith and fair dealing with respect to commercial contractual transactions, not employment relationships, and are therefore inapplicable. Accordingly, the district court did not err in granting the motion for summary judgment on Wells's breach of the covenant of good faith and fair dealing claim.

### E. Intentional Infliction of Emotional Distress Claim

Wells argues that Huish's conduct in its investigation and decision to terminate him for pursuing a lawful workers' compensation benefits claim give rise to a viable claim for intentional infliction of emotional distress.

■ In *Craft v. Rice*, the Kentucky Supreme Court articulated the elements of proof necessary to sustain a cause of action for intentional infliction of emotional distress: 1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe. 671 S.W.2d 247, 249 (Ky. 1984) (citing *Moore v. Allied Chemical Corp.*, 480 F.Supp. 364 (E.D.Va.1979). The *Craft* court also adopted Section 46 of Restatements (Second) of Torts (1965) which states, in pertinent part:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

671 S.W.2d at 251.

In *Humana of Ky., Inc. v. Seitz*, the Kentucky Supreme Court further defined the elements necessary for such a claim when it stated that " '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atro-

cious, and utterly intolerable in a civilized community.'" 796 S.W.2d 1, 3 (Ky.1990) (emphasis omitted) (quoting the Restatements (Second) of Torts, § 46 cmt. d (1965)); *accord Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 806 (6th Cir. 1994).

■ Wells contends that Huish's conduct in its investigation and decision to terminate him was outrageous and constituted an intentional infliction of emotional distress. With respect to the investigation and termination, a company's decision to exercise its legal right to investigate employee wrongdoing and to discipline an employee based on the investigation does not amount to intentional infliction of emotional distress under Kentucky law. *See Hayes v. Bakery Confectionery & Tobacco Workers Int'l Union of Am.,* 753 F.Supp. 209, 215 (W.D.Ky.1989) (stating that "the actor is never liable where he has done no more than to insist upon his legal rights in a permissible way") (citing the Restatements (Second) of Torts, § 46 cmt. g (1965)). Although Huish's investigation of potential employee wrongdoing was intentional, it was not reckless and certainly did not offend "generally accepted standards of decency and morality." *Craft,* 671 S.W.2d at 249. Even assuming that Huish unlawfully terminated Wells for pursuing a workers' compensation benefits claim. Huish's conduct was not sufficiently "outrageous in character" to establish a claim for intentional infliction of emotional distress. *Seitz,* 796 S.W.2d at 3.

■ Finally, Wells contends that *Kroger v. Willgruber,* in which the Kentucky Supreme Court concluded that the plaintiff met the threshold for an intentional infliction of emotional distress claim resulting from his employer's post-termination conduct, is analogous to the facts of the instant matter and supports his claim. 920 S.W.2d 61, 65 (Ky.1996). In *Willgruber,*

the plaintiff was subjected to post-termination surveillance, a denial of disability benefits, and a misrepresentation of his rights—all of which resulted in his suicide attempt after a lengthy period of depression. 920 S.W.2d at 63. Here, there is no evidence that Huish employees harassed Wells and although Wells offered allegations of embarrassment, loss of sleep, and damage to his reputation to support his claim, he did not seek treatment or take any medication to address his emotional distress. These alleged injuries, standing alone, do not evince severe emotional distress and are insufficient to establish a claim of intentional infliction of emotional distress. *See, e.g., Pierce,* 40 F.3d at 806 (holding that comments made by supervisors that the plaintiff was a murderer, rapist, or child molester, and the act of dumping his personal belongings on the road did not support an intentional infliction of emotional distress claim); *Seitz,* 796 S.W.2d at 2 (holding that nurse's conduct in telling patient to "shut up" and informing her that her stillborn baby would be disposed of at the hospital was insufficient to support a claim of intentional infliction of emotional distress). Accordingly, the district court did not err in granting Huish's motion for summary judgment on Wells's claim of intentional infliction of emotional distress.

## IV. CONCLUSION

Because Wells did not establish that there is a genuine issue of material fact to survive summary judgment, the district court properly granted Huish's motion for summary judgment on Wells's breach of contract, fraudulent misrepresentation, retaliatory termination, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress claims.

For the foregoing reasons, we AFFIRM the decision of Judge Thomas B. Russell of the United States District Court for the Western District of Kentucky.

