NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0181n.06

No. 16-6258

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 23, 2017
DEBORAH S. HUNT, Clerk

DONALD BUSH,

    Plaintiff-Appellant,

v.

COMPASS GROUP USA, INC.,

    Defendant-Appellee.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF KENTUCKY

BEFORE:    CLAY, SUTTON, and GRIFFIN, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff Donald Bush appeals from the order entered by the district court on July 13, 2016 granting summary judgment to Defendant Compass Group USA, Inc. On appeal, Bush argues that the district court overlooked genuine issues of material fact as to his claims against Compass Group for: (i) disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.040 ("KCRA"); and (ii) unlawful retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"), and the Kentucky Workers' Compensation Act, Ky. Rev. Stat. § 342.197 ("KWCA"). He asks us to vacate the district court's summary judgment order, and remand for trial. We have subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

    For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

### I.    Factual History

Donald Bush is a resident of the Louisville, Kentucky area. For roughly two years between 2010 and 2012, Bush was employed as a chef manager by Eurest Dining Services, an entity controlled by Compass Group. His direct supervisor was Bill Tardy, the District Manager for Eurest. Bush's job duties as a chef manager involved supervising a staff of six cooks, and providing food preparation and catering services for Eurest's clients. Bush was assigned to work in the on-site café of one of Eurest's clients, an insurance company called Kentucky Farm Bureau ("KFB").

On May 17, 2012, Bush sent an email to three high-ranking KFB managers: (i) notifying them that he suffered from cervical/thoracic spondylosis, a degenerative back condition, (ii) informing them that he wished to attempt to transfer to a less physically demanding job within Compass Group; and (iii) requesting their assistance in bypassing Bush's supervisor, Tardy, because Bush predicted that Tardy would not be amenable to the transfer.[1] The full email read as follows:

> I have been diagnosed with severe cervical / thoracic spondylosis which has rapidly progressed since Oct 2011 and is negatively affecting me physically / emotionally both here and at home. I have another appointment at Norton Letherman Spine Center to be tested for Ankylosing Spondylitis due to current additional symptoms. Both conditions are chronic and progressive, treatable, but not curable and require behavior modifications to slow the progression. In the best interests of us all I am trying to transfer to a new property in the Flick sector of Compass Group that is in need of a Chef Manager that is more manager / director than chef and has minimal caterings. The position would not start until the new school year which will allow time for acclimating a new Chef Manager to KFB with a smooth transition. I feel that Bill Tardy will oppose this and possibly even try to throw a stopper to it in which case I will need any assistance you can give. I have two large caterings next week that I have arranged additional labor for and will be able to get through without issue. I intended to discuss this with you at our next meeting. I apologize for any inconveniences and appreciate everything.

---

[1] Bush later admitted that he had no basis for his belief that Tardy would block his transfer request.

(R. 26-2, PageID # 300.) The KFB managers subsequently testified that they understood Bush's email to mean that he planned to move on to another job by fall 2012, and that he would "provide for a smooth transition" for his replacement. (R. 26-4, PageID # 379.)

Over the next several months, Bush applied for ten positions (including one position twice) within Compass Group, most of which would have been promotions over his chef manager position. Bush was rejected for each of these positions either because he did not meet the position's qualifications, or because the position was ultimately not filled due to business restructuring.

While Bush was applying for new jobs in the second half of 2012, his physical condition deteriorated, and Bush provided Tardy with several notes from his treating physicians ultimately limiting Bush to lifting no more than ten pounds. Bush testified during his deposition that the chef manager position regularly required him to lift up to fifty pounds—meaning that his back condition effectively prevented him from performing the physical duties associated with his job. In order to cover those duties, Bush hired additional temporary workers, which increased the cost of performing services for KFB.

Curiously, during this same period, Bush repeatedly told KFB management that he could not perform his duties as chef manager, and that he wanted to transfer to a different position within Compass Group, even though KFB was not his employer. This left KFB concerned about Bush's ability to both meet KFB's catering requirements, and to continue operating the Eurest-run café at KFB's headquarters. On August 27, 2012, KFB asked Eurest to accelerate the transition to Bush's replacement so that a reliable chef manager would be in place in time for KFB's October board meetings.

On September 13, 2012, Tardy placed a job posting for a new chef manager. Tardy's plan was to hire a new chef manager, and then have Bush stay on temporarily at KFB to train the new hire while Bush looked for other work. Bush assisted Tardy in searching for a replacement chef manager by setting up cooking tests for prospective candidates.

During one such test on October 25, 2012, Bush "cracked" when he realized that he would likely lose his job within Compass Group, and had "a nervous breakdown" that his "doctor said . . . was post traumatic stress disorder." (R. 26-2, PageID # 235.) Bush left during the test without informing Tardy or obtaining permission to miss the rest of the work day. Later that evening, Bush called KFB's director and notified him that Bush would not come in the next morning to open KFB's café. Bush checked into a hospital for psychiatric care on October 26, 2012. Tardy covered Bush's job duties at KFB that day, and hired Bush's replacement on October 29, 2012.

After Bush's breakdown on October 25, 2012, KFB management insisted to Eurest that Bush be replaced. Compass Group planned to give Bush six-to-eight weeks to try to find other employment, and then to terminate his employment at the end of that period.

On October 29, 2012, Bush submitted a request for FMLA leave, which was granted for the period October 26, 2012 through January 18, 2013. Bush was released to return to work by his doctors on December 7, 2012. Because Bush had been replaced, and KFB no longer wished to work with him, Bush remained on leave status and did not return to work as a chef manager. On January 7, 2013, Compass Group offered Bush a severance package, which he declined. Bush was laid off on January 10, 2013, retroactive to December 10, 2012.

## II.    Procedural History

On February 4, 2014, Bush brought suit against Compass Group in the Jefferson County, Kentucky Circuit Court, asserting claims for: (i) disability discrimination under the Americans with Disabilities Act and the Kentucky Civil Rights Act; (ii) unlawful retaliation under the Family and Medical Leave Act; and (iii) unlawful retaliation under the Kentucky Workers' Compensation Act. Compass Group removed the suit to the Western District of Kentucky. After extended discovery, Compass Group moved for summary judgment on all claims.

On July 13, 2016, the district court granted Compass Group's summary judgment motion in its entirety. *Bush v. Compass Grp. USA, Inc.*, 194 F. Supp. 3d 580, 589 (W.D. Ky. 2016.) As to Bush's workers' compensation retaliation claim, the district court determined that

undisputed record evidence showed that Compass Group fired Bush because he could not continue to function as a chef manager, and concluded that the four-to-eight month gap between when Bush reported his workplace injuries and his firing was insufficient to create a triable fact issue. *Id.* at 585–86. The district court next determined that Bush could not state a *prima facie* case of disability discrimination because he admitted during his deposition that he was physically incapable of continuing as a chef manager, with or without accommodations. *Id.* at 587–88. Finally, the district court dismissed Bush's FMLA retaliation claim because the record showed that Compass Group planned to fire Bush before he even decided to take FMLA leave. *Id.* at 588–89.

The district court entered judgment against Bush the same day it released its summary judgment opinion. On August 8, 2016, Bush filed a timely notice of appeal.

## DISCUSSION

### I.      Standard of Review

We review *de novo* the district court's grant of summary judgment. *See, e.g.*, *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 862 (6th Cir. 2017). A movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). A "genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

**II.     ADA and KCRA Claims**

**A.     Qualified Individual with a Disability**

The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similarly, the Kentucky Civil Rights Act makes it an "unlawful practice" for an employer to "discharge any individual . . . because the person is a qualified individual with a disability . . . ."  Ky. Rev. Stat. § 344.040(1)(a).  We "interpret Kentucky protections for the disabled consonant with the federal Americans with Disabilities Act," *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001), except that the federal definition of a disability is broader than Kentucky's definition by virtue of the ADA Amendments Act of 2008.  *See Breen v. Infiltrator Sys.*, 417 F. App'x 483, 486 (6th Cir. 2011) ("Although Congress recently expanded the definition of 'regarded as disabled,' . . . that amendment has yet to be incorporated into the Kentucky statute . . . so the pre-2008 ADA standards apply . . . .").  Because the parties concede that Bush is disabled within the meaning of both statutes, we will analyze Bush's ADA and KCRA claims together.

ADA discrimination claims are governed by the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).  Under that framework: (i) the plaintiff must first "establish a prima facie case of discrimination;" (ii) then the defendant must articulate legitimate, non-discriminatory reasons for its actions; and finally (iii) "the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination."  *Id.*

"To prove a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir.

2014). The plaintiff must prove that his disability was the "but-for" cause of his termination. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

The district court granted summary judgment against Bush's ADA and KCRA claims at the first step of the *McDonnell Douglas* framework because it determined that Bush failed to make out a *prima facie* case of disability discrimination. *Bush*, 194 F. Supp. 3d at 587–88. Specifically, the district court determined that Bush is not "otherwise qualified to perform the essential functions" of his prior chef manager job because: (i) the job requires him to be able to lift up to fifty pounds; and (ii) he is incapable of performing that sort of heavy lifting. *Id.* We agree with the district court that there is no genuine dispute as to whether Bush can perform the essential functions of his prior position, with or without accommodations.

In order to determine whether Bush could meet the essential functions of the chef manager position, we must first determine what those essential functions are. EEOC regulations define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013). "Factors to consider when determining whether a job function is essential to the position include: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Id.* at 925–26.

The written job description for Compass Group's chef manager position states that while "performing the duties of this job, the employee is regularly required to stand; use hands to finger, handle, or feel; talk or hear; and taste or smell. The employee frequently is required to walk, sit, and reach with hands and arms. The employee must frequently lift and/or move up to

10 pounds." (R. 30-1, PageID # 758.) Under the ADA, this description "shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). However, the written job description is "not dispositive." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014). Rather, "the determination of whether physical qualifications are essential functions of a job requires the court to engage in a highly *fact-specific* inquiry" and must "reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) (emphasis in original).

Ordinarily, the question of whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926. Thus, we will not grant summary judgment when the "evidence on the issue is 'mixed.'" *Rorrer*, 743 F.3d at 1039 (quoting *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012)).

Here, however, the record is not "mixed"—uncontroverted evidence shows that lifting up to fifty pounds was an essential part of Bush's job duties. During his deposition, Bush confirmed that the written job description did not accurately reflect his actual job duties. Specifically, when asked about the description's statement that candidates needed to be able to lift up to ten pounds, Bush stated that he "was lifting and moving quite a lot more than that." (R. 30-1, PageID # 735.) Bush confirmed that he was required to move cases of meat and fifty-pound bags of potatoes and sugar. (*Id.*) Moreover, Bush stated he was lifting heavy weights "for quite a bit of my employment" because he would have to assume the duties of less senior cooks when they did not show up for work. (*Id.*) When asked if lifting heavy weights "was essential" to his job, Bush responded "Yes. Yes." (*Id.*)

Further, in Bush's post-deposition affidavit, Bush confirmed that his "actual job duties were different from those in the written description" in that "[w]hen shipments of stock arrived during service hours and all other employees were working/prepping their stations it was up to me to put away stock in its proper area as quickly as possible to maintain food and kitchen safety. These items were most often bulk packaged and heavy such as 50lbs potatoes, 50lbs sugar, 50lbs flour, 35lb cases of #10 canned products, 30lbs bag in box beverage products etc."

(R. 30-3, PageID # 803.) Bush also stated that when "performing entree multi course catering I would often have to carry and move tables and chairs weighing well above 10lbs. I had to prepare and carry chaffers of food, move and set up service stations, and man carving stations which involved lifting and carrying whole muscle meats and 30+ lb cases of prime rib, turkeys, and so on. I would also have to often tear everything down as well." (*Id.* PageID # 803–04.) Finally, Bush acknowledged that he "understood that both Kentucky Farm Bureau and Bill Tardy expected me to lift up to fifty pounds while cooking food and running catering events." (*Id.* PageID # 804.)

In arguing that there is an issue of material fact regarding whether heavy lifting was an essential part of his job duties, Bush points to sections of Tardy's deposition testimony where Tardy explains that the chef manager position is mostly a supervisory role, and that most of the chef manager's physical duties can be delegated to subordinates. But Tardy's statements do not contradict Bush's representations that heavy lifting was a regular and essential part of his job. Rather, they are consistent with Bush's representations that he would have to perform heavy lifting when one of his subordinates missed work, or when catering events. We hold that no reasonable jury could find that heavy lifting was an inessential part of the chef manager job when Bush himself repeatedly admitted that it was essential.[2]

Accordingly, we must determine whether there is a genuine factual dispute as to whether Bush could perform the essential functions of the chef manager position—including lifting up to fifty pounds—with or without reasonable accommodations. *Demyanovich*, 747 F.3d at 433. The record is clear that he could not perform these functions.

---

[2] Bush cites *Hall v. United States Postal Service* to bolster his argument that a jury trial is needed to determine whether lifting up to fifty pounds was an essential part of Bush's job, but *Hall* is easily distinguishable. In that case, the plaintiff was not placed in a clerk position because he could not lift up to seventy pounds, as required by the written job description. *Hall*, 857 F.2d at 1075. But the plaintiff testified that he had never been required to do any heavy lifting as a clerk, and the employer's only evidence of the seventy-pound requirement was the job description; thus there was a genuine fact issue as to whether such lifting was an essential part of the job. *Id.* at 1075, 1079. By contrast, Bush's own deposition testimony clearly establishes that lifting up fifty pounds was a regular and essential feature of his work.

During his deposition, Bush consistently and repeatedly affirmed that he could not handle the physical demands of the chef manager position, even with accommodations. The following is a particularly illuminating passage that represents the gist of Bush's testimony:

Q.    Back condition?

A.    Yeah.

Q.    That the company somehow fired you from employment because of discrimination because of that disability?

A.    Yes.

Q.    And that's because even though you couldn't go back and do the chef manager job because of the physical requirements that you think they should have hired you for one of these ten jobs that you applied for?

A.    Yes.

Q.    *But going back and doing the chef manager job was not something you could do?*

A.    *No.*

Q.    *There's nothing that they could do to help you do all those physical requirements either?*

A.    *No.*

(R. 26-2, PageID # 267 (emphasis added).)

However, in his post-deposition affidavit, Bush walked back his deposition testimony by stating that at all times he "was able to perform the duties of a chef manager, as described in the written job description," even though he went on to state that the written job description did not accurately describe the weight lifting requirements for the position. (R. 30-3, PageID # 803.) Bush further stated that he "could have continued to work as a chef manager at Kentucky Farm Bureau if [he] did not have to lift items heavier than 10 pounds." (*Id.* PageID # 804.)

Bush argues that there is a genuine dispute as to whether he can perform the duties of a chef manager because: (i) his post-deposition affidavit states that he could perform those duties as long as Compass Group provided him with additional laborers to help with the heavy lifting; and (ii) in his deposition, Bush testified that he actually performed the heavy-lifting aspects of his job—albeit with pain—after his back condition manifested. The district court refused to

consider his post-deposition affidavit because it contradicted his deposition testimony, and further found that there was no dispute that Bush could not function as a chef manager because he repeatedly said as much during his deposition.

The district court's refusal to consider the affidavit was proper. We have long held that a "party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). In determining whether to credit a post-deposition affidavit, we consider whether the affidavit directly contradicts prior deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). In determining whether the affidavit is a sham, we consider a "nonexhaustive list of factors" including "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* at 908–09 (quoting *Franks*, 796 F.2d at 1237).

Here, Bush's affidavit directly contradicted his deposition testimony in a key way. During his deposition, Bush answered "No" when asked whether any accommodations would allow him to perform the physical duties of his chef manager position. (R. 26-2, PageID # 267.) In his affidavit, Bush stated that he "could have continued to work as a chef manager" if Compass Group provided him an "accommodation" by hiring "dependable labor to do the lifting and carrying for me." (R. 30-3, PageID # 804). These statements directly contradict one another, and therefore not only did the district court properly decline to consider the

contradictory statements in the affidavit, the district court would have been justified in striking the affidavit entirely. *Aerel*, 448 F.3d at 908; *Reid*, 790 F.2d at 460.

Further, Bush's testimony during his deposition that he had performed heavy lifting with pain after his back injury, and therefore could have continued in the chef manager role, does not create a genuine factual dispute. As Compass Group rightly argues, the fact that Bush was able to continue his job duties for a time after his back problems started does not contradict the evidence in the record that Bush's back injury eventually worsened, and by the time he was terminated, his doctor had restricted him to lifting no more than ten pounds.

Moreover, at best, Bush has demonstrated that his deposition testimony was internally contradictory—he repeatedly stated that he could not perform the physical requirements of his job, but implied at other times that he had met those requirements even after his back condition arose. Courts have repeatedly held that a plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact. *See, e.g.*, *Pina v. Children's Place*, 740 F.3d 785, 799 (1st Cir. 2014) (holding that summary judgment was appropriate where plaintiff's admissions in deposition undermined her claims); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming summary judgment where plaintiff's deposition testimony was "replete with inconsistencies" (citation omitted)); *United States v. 1980 Red Ferrari*, 827 F.2d 477, 480 n.3 (9th Cir. 1987) (affirming summary judgment where only evidence was plaintiff's "incredible and contradictory" deposition testimony); *Hayes v. Norfolk S. Corp.*, 25 F. App'x 308, 314 (6th Cir. 2001) (holding that appellant's "contradictory" and "confused" testimony was insufficient to create fact issue). Although the non-moving party is entitled to all reasonable inferences when evaluating a summary judgment motion, when a plaintiff's claims are only supported by his "own contradictory and incomplete testimony . . . no reasonable person would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555 (citation and alteration omitted). Because Bush's own deposition testimony consistently and repeatedly proclaimed that he could not

function as a chef manager, even with accommodations, we hold that no reasonable jury could find in Bush's favor on his disability discrimination claims.

## B.    Reasonableness of Accommodations

Although Bush's failure to make a *prima facie* showing of disability discrimination is fatal to his claim, we note that even if Bush had made such a showing, his claims would still fail because the accommodations he requested from Compass Group were not reasonable. "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 (6th Cir. 1998)). In this suit, Bush has proposed two potential accommodations: (i) Compass Group could have hired additional staff to perform all of Bush's heavy physical labor for him; or (ii) Compass Group could have transferred him to one of the ten positions within the organization that he applied for.

Neither of these accommodations are objectively reasonable. We have consistently held that a proposed accommodation requesting that an employer remove "an 'essential function' from the position . . . is *per se* unreasonable." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (quoting *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)); *see also* 29 C.F.R. Part 1630.2(o) App'x ("An employer . . . is not required to reallocate essential functions."). As explained earlier, lifting more than fifty pounds is an essential function of a chef manager; accordingly, it is *per se* unreasonable for Bush to request that Compass Group assign these aspects of his job to someone else. *Ford*, 782 F.3d at 761.

Moreover, Bush's request to be re-assigned to the vacant positions within Compass Group that he applied for was also unreasonable. We have held that: (i) the "ADA does not require an employer to offer an employee a promotion as a reasonable accommodation;" and (ii) an employer is not "required to waive legitimate, non-discriminatory employment policies . . . in order to accommodate a disabled employee." *Hedrick*, 355 F.3d at 457. All of the

positions Bush applied for except one would have constituted promotions over his chef manager position.[3] And Bush disqualified himself from the one lateral position he applied for because he violated company policy by failing to inform Tardy that he was requesting a transfer. Accordingly, because re-assigning Bush to any of the positions he sought would have required Compass Group to promote him or waive its non-discriminatory transfer policy, this requested accommodation was unreasonable as a matter of law.[4] *Id.*

## III. FMLA Claim

We have explained the framework governing FMLA claims as follows:

The FMLA enables employees covered by the Act to take up to twelve weeks of leave per year for various purposes specified in the statute, including the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). At the expiration of the employee's leave period, she must be reinstated to her position or to a position equivalent in pay, benefits, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1).

*Bryson v. Regis Corp.*, 498 F.3d 561, 569–70 (6th Cir. 2007).

Two distinct theories for recovery on FMLA claims exist. The "entitlement" or "interference" theory arises from § 2615(a)(1), which states that "[i]t shall be

---

[3] In late 2012, Compass Group's HR staff discussed the possibility with Bush of having him serve as an *ad hoc* auditor for one of Eurest's accounts until he could secure permanent employment. At oral argument, Bush's counsel argued that Compass Group should have accommodated Bush by solidifying this hypothetical auditor role as a new, full-time position and offering Bush that job. We reject this argument. The ADA "does not require employers 'to create new jobs . . . in order to accommodate a disabled individual.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)).

[4] *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1300–01 (D.C. Cir. 1998) (en banc), does not support Bush's argument that Compass Group violated the ADA by failing to give him one of the ten jobs he applied for. *Aka* merely held that a plaintiff has statutory standing to pursue an ADA claim based on an employer's failure to reassign the plaintiff to a vacant position as long as the plaintiff can perform the essential duties of the new job with reasonable accommodations. *Id.* It does not hold that employers are required to place disabled employees in positions they are not qualified for, or that would constitute promotions; thus, Bush cannot benefit from *Aka*'s reasoning.

unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," and from § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

*Arban v. W. Pub. Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003).

Bush is pursuing an FMLA retaliation theory based solely on circumstantial evidence. "Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Bryson*, 498 F.3d at 570.

A plaintiff "can make out a prima facie case of discrimination by showing that (1) she availed herself of a protected right under the FMLA by notifying [the employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

Compass Group conceded before the district court that Bush has made out the first two elements of a *prima facie* FMLA retaliation claim. *Bush*, 194 F. Supp. 3d at 589. However, the district court determined that Bush failed to create a genuine dispute as to whether his termination was causally related to his FMLA leave because "the wheels were in motion for [his] termination before he left on October 25, 2012." *Id.* We agree.

The sole evidence that Bush points to in arguing that his termination was causally related to his FMLA leave is that he was laid off on January 10, 2013 (backdated to December 10, 2012)—about one month after his leave expired on December 7, 2012. This "Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), *abrogated on other grounds by Gross v. FBL Fin.*

*Servs., Inc.*, 557 U.S. 167, 180 (2009); *Krumheuer v. GAB Robins N.A., Inc.*, 484 F. App'x 1, 5 (6th Cir. 2012) ("[W]e have concluded that temporal proximity alone is sufficient to establish a prima facie case of FMLA retaliation.").[5]

However, contrary to Bush's implicit assumption, the relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is the "time after an employer learns of a protected activity," not the time after the plaintiff's FMLA leave expires. *See, e.g.*, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Krumheuer*, 484 F. App'x at 5. The record shows that Compass Group learned of Bush's FMLA leave on October 29, 2012—approximately two-and-one-half months before he was terminated. The "more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey*, 516 F.3d at 524–25).

---

[5] Curiously, although temporal proximity evidence is sufficient to establish a *prima facie* case of FMLA retaliation, *DiCarlo*, 358 F.3d at 421, we have held that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001); *see also Krumheuer*, 484 F. App'x at 5 (explaining this Circuit's inconsistent approach regarding the sufficiency of temporal proximity in FMLA retaliation claims). This is an oddity in our case law; ordinarily, a *prima facie* showing of discrimination under the *McDonnell-Douglas* framework "is sufficient to support an inference of discrimination at trial." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) ("[B]ecause a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination."). Thus, *DiCarlo* and *Skrjanc* cannot both be correct; either temporal proximity evidence is sufficient to both establish a *prima facie* showing of FMLA retaliation, and rebut an employer's proffered non-discriminatory reasons for the adverse employment action, or it is insufficient to do either. We need not resolve this conflict now, however, because the alleged temporal proximity between Bush's FMLA leave and his termination does not establish a *prima facie* showing of retaliation when viewed against the record as a whole.

In this case, Bush put forward no other evidence to support his FMLA retaliation claim, and the uncontested evidence in the record overwhelmingly undermines his claim. Bush himself summarized the fatal flaw with his FMLA retaliation theory in his appellate briefing:

> *Much of the evidence indicates that Compass Group terminated Bush to please its client KFB and to make sure it could keep charging KFB for services.* It has also claimed that Bush refused to work for Tardy and therefore Bush himself chose to be terminated.

(App. R. 20 at 51 (emphasis added).) This is an accurate summary of the record. On October 25, 2012, after Bush left work without notice in the middle of the "chef test" for his potential replacement, Lisa Daniszewski—a member of Compass Group's human resources staff— acknowledged that "the client [KFB] [was] insistent on [Bush's] removal and will not further discuss," and laid out a plan for transitioning Bush out of the chef manager position. (R. 30-6, PageID # 828.) However, to put it bluntly, it was not illegal for Compass Group to fire Bush to please a client.[6] Rather, Bush was required to put forward evidence showing that Compass Group fired him for exercising his FMLA rights, and his failure to do so is fatal to his claims.

Moreover, the record shows that Compass Group had decided to terminate Bush's employment before he even notified Compass Group of his intent to take FMLA leave. On October 25, 2012, Daniszewski stated that Compass Group's plan was to send Bush the paperwork for a leave of absence in case he wanted to take such leave, "and have him help out at other accounts while he continues to look for work internally and externally. If this continued on for more than 6-8 weeks, [Compass Group] would look at enhanced severance with a release of claims." (*Id.*)

---

[6] Federal civil rights law generally does not interfere with an employer's ability to terminate employees for legitimate business reasons, such as the desire to retain a client, as long as the termination was not substantially motivated by improper discrimination. Thus, a business may terminate an employee because he has a poor working relationship with a client, but not because the client refuses to work with persons of the employee's race. In this case, the record shows that Bush was fired because KFB no longer thought him reliable, and Compass Group did not have a position for him elsewhere—not because he took FMLA leave.

In other words, uncontested record evidence shows that on October 25, 2012, Compass Group was planning on terminating Bush's employment as a chef manager in six-to-eight weeks if he did not secure another position internally or externally. Compass Group did not learn of Bush's intent to take FMLA leave until October 29, 2012. Therefore, the record clearly rebuts any inference that Bush was fired in retaliation for taking FMLA leave, because Compass Group had decided to let him go four days prior to learning that he would take such leave. Accordingly, we hold that the district court did not err in granting summary judgment against Bush's FMLA retaliation claim.

## IV. KWCA Claim

The Kentucky Workers' Compensation Act provides that no "employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim" for workers' compensation benefits. Ky. Rev. Stat. § 342.197(1). In KWCA cases "where there is no direct evidence of retaliation, as is the case here, the burden of production and persuasion follows the familiar *McDonnell Douglas* framework." *Ky. Dep't of Corrs. v. McCullough*, 123 S.W.3d 130, 133–34 (Ky. 2003); *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915–917 (Ky. Ct. App. 2006).

A plaintiff can establish a *prima facie* case of workers' compensation discrimination through "proof that: (1) he engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Dollar Gen.*, 214 S.W.3d at 915. The parties agree that Bush has satisfied the first three elements, but the district court found that there was no genuine issue as to whether Bush's termination was caused by his workers' compensation claims. *Bush*, 194 F. Supp. 3d at 587.

"The plaintiff is not required to demonstrate that the sole or even the primary reason for the termination was related to the protected activity but only that its pursuit was a 'substantial and motivating factor' in the decision to terminate." *Dollar Gen.*, 214 S.W.3d at 915. "In most cases, this requires proof that (1) the decision maker responsible for making the adverse decision

was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 804 (Ky. 2004). "The sooner adverse action is taken after the protected activity, the stronger the implication that the protected activity caused the adverse action, particularly if no legitimate reason for the adverse action is evident." *McCullough*, 123 S.W.3d at 135. In determining whether temporal proximity between the plaintiff's benefits claim and his firing is sufficient to sustain a retaliation claim, we must "view the time between the two events in the context of the entire circumstances." *Dollar Gen.*, 214 S.W.3d at 916.

Bush's sole evidence of KWCA retaliation is the alleged temporal proximity between the instances where he reported his workplace injury to Compass Group, and his firing. Bush reported workplace injuries on May 11, May 31, August 3, and August 16, 2012, and was fired on January 10, 2013.[7] Thus, he was fired between four and eight months after he made each respective injury report.

This temporal proximity does not raise a triable fact issue as to whether Bush was discharged for pursuing workers' compensation claims for two reasons. First, under Kentucky law, temporal proximity between a worker's protected activity and an adverse employment action is generally insufficient to sustain a retaliation claim where, as here, the plaintiff "does not point to any other facts or circumstances which would support an inference that [the employer] retaliated against [the plaintiff] based on [the workers' compensation] claim." *See Collins v. Sapphire Coal Co.*, No. 2010–CA–000690–MR, 2011 WL 4633099, at *3 (Ky. Ct. App. Oct. 7, 2011) (affirming grant of summary judgment on workers' compensation retaliation claim where

---

[7] Compass Group made a formal report of a workplace injury, at Bush's request, on August 13, 2012. Although it does not appear that Bush ever actually filed a workers' compensation claim, Kentucky law does not require the actual filing of a claim as long as the plaintiff was "pursuing a lawful claim for workers' compensation benefits." *Overnite Transp. Co. v. Gaddis*, 793 S.W.2d 129, 132 (Ky. Ct. App. 1990). The parties agree that Bush was engaging in protected activity when he reported his workplace injury.

plaintiff pointed to no other evidence of retaliation other than three month gap between claim and firing).

Second, Bush has not shown that his workers' compensation claims were a "substantial and motivating factor" in his discharge, because the record provides a plethora of evidence that Compass Group fired him for legitimate reasons. *Dollar Gen.*, 214 S.W.3d at 915. As discussed earlier, Bush admitted that he could not perform the essential job duties of a chef manager. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 654 (6th Cir. 2001) (affirming summary judgment on Kentucky workers' compensation retaliation claim where record evidence showed that plaintiff would have been fired because of her post-injury physical limitations regardless of workers' compensation claim); *Southerland v. Hardaway Mgmt. Co., Inc.*, 41 F.3d 250, 256 (6th Cir. 1994) (affirming summary judgment on Kentucky workers' compensation retaliation claim where "the evidence support[ed] the defendant's assertion that the plaintiff was discharged solely because of her inability to perform her job"). And moreover, Compass Group's decision to terminate Bush was cemented when he walked off his job without permission, and Compass Group's client (KFB) demanded his removal. *See Wells v. Huish Detergents, Inc.*, 19 F. App'x 168, 178 (6th Cir. 2001) (affirming summary judgment on Kentucky workers' compensation retaliation claim where the "evidence clearly demonstrate[d] that [the plaintiff] would have been discharged regardless of his injury" because "he violated Company policy"). The relatively long gap between Bush's workers' compensation claims and his termination is simply not enough to support a viable retaliation claim in light of the unrebutted record evidence showing that he was fired for nondiscriminatory reasons.

## CONCLUSION

For the foregoing reasons, we hold that the district court correctly granted summary judgment against Bush's disability discrimination, FMLA retaliation, and workers' compensation retaliation claims. Accordingly, we **AFFIRM** the district court's judgment.