Paul L. Maloney, United States District Judge
This matter is before the Court on Defendant Envoy Air Incorporated's motion for summary judgment. Because Envoy articulated a legitimate and nondiscriminatory reason for discharging Plaintiff Armando Nieves and because Nieves has not been able to present sufficient evidence of pretext to create a trial issue, the Court will grant the motion for summary judgment and dismiss the case with prejudice.
I. BACKGROUND
Armando Nieves began working for American Eagle airlines (an affiliate of American Airlines and the predecessor to Defendant Envoy Air Incorporated) in Chicago in 1997. He and his wife, Sahara Vargas (a fellow Envoy employee) first moved to Springfield, Missouri to work in an airport there, and then moved again to Grand Rapids, Michigan to work at the Gerald R. Ford Airport ("GRR") in 2008. Both Nieves and Vargas work for Envoy.
Nieves worked as a gate agent. Envoy's gate agents had dual responsibilities; they worked "above-wing" at the ticketing counters and customer service desks and "below-wing" outside at the gates directing planes and loading luggage. By all accounts, Nieves was a model employee and was well-liked by coworkers and airline customers. (ECF No. 45-7 at PageID.597.) He was also named the designated trainer for new employees, earning him an extra dollar per hour.
In 2014, Envoy transferred a new General Manager named Mitch Felkey into GRR. Shortly after Felkey joined GRR, small conflicts arose between Nieves and Felkey. On one occasion, company training files were lost. (ECF No. 45-6 at PageID.577) Felkey blamed Nieves, and he did not apologize or otherwise rectify the situation when the files turned up. Another time, Felkey believed that Nieves was absent from his duty station and demanded that he obtain statements from four coworkers to corroborate that he was assisting at a ticketing counter. (ECF No. 45-5 at PageID.544-45.) Felkey threatened that if he could not produce the statements, he would have to "turn in his badge." (Id. ) Other examples include being chosen to work below-wing more than other gate agents, (ECF No. 45-6 at PageID.577), accusations that he or his wife were making personal long-distance phone calls to their family in the Dominican Republic while at work, (Id. at PageID.574-75), and episodes in which Felkey or another supervisor named Kyle Klausner would laugh as Nieves made announcements over the intercom or made comments referencing the *964 size of Nieves' family or Hispanic background. (ECF No. 45-6 at PageID.577.)
In the Spring of 2015, American Airlines initiated a random travel audit of a large number of its employees and the employees of its affiliated airlines, including Envoy. The audit was specifically to look for abuses of travel privileges by employees. American Airlines' policy makes it a terminable offense for an ineligible family member of an employee to use travel benefits. In other words, if someone does not met the criteria for travel privileges as a family member as defined by American (e.g., a child, spouse, or parent) and that person travels, it is grounds for termination of the employee.
American's Employee Travel Privilege Department is responsible for administering all facets of the employee travel privileges program, including random audits of employees' use of travel privileges. (ECF No. 44-18 at PageID.438-39.) The department oversees two types of audits-random audits that occur two to four times a year and include multiple employees and specific audits of individual employees, usually triggered by a request from a supervisor. (Id. at PageID.440-42.) The department sends out initial letters to the audited employees and coordinates individual investigations with human resources representatives employed by American and its affiliated airlines. (Id. at PageID.443.)
In April of 2015, the Travel Privileges Department allegedly sent Nieves a letter indicating that he was included in the "random dependent / student audit Q2-15". (ECF No. 44-18 at PageID.449.) Nieves did not get this letter, and a second letter followed in June, indicating the same and requesting that he provide documentation for "some of [his] family members including qualified children." (ECF No. 45-11 at PageID.627.) After receiving the letter, Nieves faxed documents relating to his stepdaughter Sharina and his wife Sahara-the only family members that were active on his travel list. (ECF No. 45-12.)
However, over the course of Nieves' employment with Envoy, he had listed a number of other family members. Between Nieves and Vargas, they had seven children. (ECF No. 45-6 at PageID.573.) Some of the children had been listed multiples times as their status changed from children to students. (ECF No. 44-10 at PageID.218-19) There were also duplicate entries on the travel list because of some misspellings. (Id. ) These mistakes made it appear that Armando had an extremely large travel privileges list-totaling 24 names for Nieves, Vargas, Vargas' mother, their seven children, and Nieves' mother and her boyfriend. (Id. )
In addition to their children, Nieves listed two other people as students or children at different points in his employment with Envoy. The first, Arnaldo Melo, came to the Nieves family from the Dominican Republic for high school in the United States. (ECF No. 45 at PageID.497.) Arnaldo's mother was close friends with Sahara Vargas, so Nieves and Vargas agreed to take Arnaldo into their home when his mother wrote to them and said that she could not take care of him any longer. Arnaldo stayed with Nieves and Vargas for approximately nine months and used travel privileges in 2004. (Id. ) The second, Denys Martinez, was Sahara's half-brother. Martinez stayed with them for a short time while he pursued higher education in the United States. He was listed on Nieves' travel privileges list as a child, but he did not use them. (ECF No.45 at PageID.497.)
According to Nieves, all that is required to transfer temporary guardianship of a child in the Dominican Republic is a letter signed by the child's parents. (ECF No. 45-5 at PageID.558-59.) He says he had *965 letters for both Melo and Martinez but Nieves and his family had not taken steps in the United States to have their guardianship of either of the minor children recognized. (ECF No. 44-13 at PageID.314 ("We had a paper signed by [Denys' mother], and we was going to-he went to Michigan, and Michigan didn't want it.").)
In addition to the two children, Nieves also listed his mother's longtime companion, Daniel Cesar, although the two had not married and did not have a recognized common-law marriage. (ECF No. 44-13 at PageID.334.) Nieves now claims that he had specifically gotten approval to list Daniel on his travel list from a previous supervisor, although nothing in the record indicates that he raised this in response to the audit at any point. (Id. )
After Nieves faxed the documents for his active travelers in June, he did not hear anything back for a significant period of time. However, emails between American Airlines and Envoy's HR Field Representative for Grand Rapids, Nina Ingalls, indicate that the audit had not come to a close. Instead, the Nieves audit was added to a stack of audits that each needed to be thoroughly investigated by HR field representatives like Ingalls.
On September 15, 2015, Mike Whittle, the Director of Human Resources for American, emailed Barbara Starcer, a senior Human Resource Analyst with Envoy and the liason between American and Envoy HR employees. Whittle wanted an update on 15 outstanding audits. (ECF No. 46-5 at PageID.802-804.) Whittle sent a follow up email three days later, indicating that the pending travel audits had "been elevated as a priority." (Id. at PageID.801.) Starcer responded that her department was working on the audits and that she had updated their respective statuses in a spreadsheet. Whittle sent a subsequent email on September 25, 2015 asking for further clarification on the travel audits pertaining to employees who were not on a leave of absence. (Id. at PageID.800.)
The auditing process moved on at a glacial pace. On January 21, 2016, Starcer emailed Ingalls and asked for an update on the outstanding 2015 audits and requested that they be closed out "as soon as possible." (ECF No. 44-5 at PageID.199-200.) The email contained a spreadsheet indicating that at least eight audits remained outstanding and that Ingalls was responsible for three of them, including Nieves. (Id. ) Ingalls responded that she had been having trouble finishing the audits but would make it a priority to contact the relevant airport managers. (Id. ) She also indicated she was considering conducting phone interviews with the subject of the audits "to speed it up a little." (Id. )
The next day, Ingalls began planning how she would finish the audits. She created a calendar entry with a subject line "Start sked for interviews for GRR Agent ... Armando Nieves." (ECF No. 45-15 at PageID.678.) She also noted in the body of the entry that "[h]e frequently does FML and CSO."[1] (Id. )
Ingalls did not yet know it, but Armando Nieves had begun suffering from a serious health condition a few weeks prior. On January 5, 2016, Nieves was hospitalized for stage-three kidney failure. (ECF No. 45-16 at PageID.694.) He spent three weeks in the Intensive Care Unit. This medical affliction left him with approximately 25 percent of his normal kidney functioning. (ECF No. 45-6 at PageID.579.) While he was recovering, Denise Erickson-another gate agent-organized a bake off, subsidized by Envoy, to *966 help support Nieves and Vargas. (ECF No. 46-4 at PageID.798.)
On January 26, 2016, Ingalls emailed Felkey to coordinate her interview with Nieves. (ECF No. 44-6 at PageId.203-04.) She indicated that she intended to conduct the interview by phone and that she noticed that he had been out sick since January 4, 2016. (Id. ) She queried whether Felkey knew when Nieves would return and asked if he had any suspicion that Nieves had been abusing his sick leave. (Id.) Felkey and Ingalls exchanged a few more emails, with Felkey informing Ingalls that he had visited Nieves in the hospital and that his condition was pretty serious. (Id. at PageID.202-03.) Ingalls responded by ensuring Felkey undertook the necessary steps for getting Nieves on FMLA leave. (Id. at PageID.202.) However, Nieves' FMLA certification had already been completed on January 12, 2016. (ECF No. 45-16.)
Nieves required approximately six weeks off to recover from his medical issues, but he was able to return to work and did so on February 19. While he was recovering, his doctors recommended that he seek work that minimized stress and lifting, so Nieves bid on and was awarded a position in the baggage service department. (ECF No. 44-14 at PageID.375.) The baggage service department then had two full-time employees, Nieves and a Caucasian woman named Andrea Brouwer. Because of his seniority, Nieves was able to work better shifts within the department and was not ordinarily scheduled on weekends. (ECF No. 45-6 at PageID.579.) According to Vargas, the Baggage Service Department was "very important" to Felkey because Envoy's performance as an airline was evaluated partially by how well it handled customer baggage. (Id. ) After Nieves began working in the baggage services department, Felkey arranged for him to attend a specialized training and noted two weeks prior to his discharge that Nieves could "really keep [Envoy] afloat]" Envoy in that department. (ECF No. 44-2 at PageID.163.)
Once Nieves was back to work, it cleared the way for Ingalls to finish the travel audit. Nieves was not informed ahead of time of the interview. A calendar entry from Ingalls indicates that she arranged to conduct the interview by phone with Nieves on March 9, with Felkey also present. (ECF No.45-15 at PageID.677.) In the notes to Felkey, Ingalls said, "It would not surprise me that some of the individuals that he has registered as relatives do not meet eligibility simply because of the volume. ... We can talk more about [potentially terminating Nieves] once we know what he has to say about his 20 or so children." (ECF No. 45-15 at PageID.677.)
During the interview, Ingalls questioned Nieves about each entry on his travel privileges list, including all of his children, step-children, and the two other wards. When it was over, Ingalls instructed Nieves to provide documentation for each of his children and letters from the parents of Denys Martinez and Arnaldo Melo to verify that Nieves and his wife actually had guardianship of them while they were listed on Armando's travel privilege log.
Nieves claims that his mother's companion, Daniel Cesar did not come up at any point in the interview. (ECF No. 44-13 at PageID.334.) Ingalls says that she asked Nieves about each of the individuals on the travel list including Cesar. (ECF No. 44-3.) Her account is corroborated by her interview notes because they include information Cesar, indicating that Nieves told her that Cesar and his mother had been together for more than twenty years but had never legally married. (ECF No.44-10 at PageID.231.) After the interview, Nieves was instructed to provide the documentation *967 to Felkey by March 18-nine days later. (ECF No. 44-3 at PageID.166.)
At some point during the next week, Nieves provided letters from the mothers of Arnaldo and Denys indicating that Nieves and his family had taken care of their children in the past. Felkey told Nieves that the letters were not the kind of documentation that would prove he had legal guardianship over the children.
On March 18, Ingalls emailed Felkey asking for copies of any documentation provided by Nieves. (ECF No. 44-8.) After receiving the documents, Ingalls prepared a brief summary of her investigation and sent it to Starcer, and Starcer's supervisor, Mariluz Duque. (ECF No. 44-9.) She informed Starcer and Duque that Nieves had not provided documentation for five individuals: Carlos Martinez, Denys Martinez, Arnaldo Melo, Daniel Cesar, and Felipa Trejo (Sahara Vargas' mother). She concluded the email "since we already know that there are 3 individuals in the child/student class and a 1 [sic] individual in the parent class that do not meet the criteria should I even bother to ask for the proof of parent-in-law relationship or should I just move on in convincing the GM that this is a violation of policy?" (Id. at PageID.213.) Duque responded that "under the matrix it consistently has been that termination is the outcome time and time again[ ]" when ineligible travelers use an employee's travel privileges; If Nieves did so, Ingalls should tell Felkey that Nieves needed to be released. (Id. at PageID.212-13.) Starcer responded that she was on board with termination. She said "we have been consistent with following the Matrix." (Id. at 212.)
After conferring with her fellow HR personnel, Ingalls forwarded a packet to Felkey to begin the "off-boarding" or termination process for Nieves. The packet prepared by Ingalls contained a summary memo, her notes from the interview with Nieves, the documentation Nieves had provided, Nieves' travel privilege list, and his travel privilege usage history. (ECF No. 44-3 at PageID.167; ECF Nos. 44-10, 44-11.) From there, the decision to terminate Nieves was reviewed by a three-person committee: Envoy's vice presidents of human resources, finance, and legal departments. The committee approved the decision to terminate Nieves. (ECF No. 44-3 at PageID.167.)
Next, Ingalls drafted a termination letter and sent it to Felkey on March 30, 2016. (Id. ; ECF No. 45-18.) Felkey approved the letter, signed it, and delivered it to Nieves. (ECF No. 44-1.) The stated justification in the letter was misrepresentation of facts, misrepresentation in obtaining employee benefits or privileges, and abuse of travel privileges. (ECF No. 45-18.)
Nieves appealed the termination to Felkey's supervisor, Greg Ricketts, who worked out of Envoy's headquarters near Dallas, Texas. In his appeal, Nieves emphasized his history with Envoy and implored Ricketts to reconsider the decision to terminate him. (ECF No. 44-17 at PageID.432.) He acknowledged that he "made a mistake when listing [Daniel Cesar] as my father, however given that I was not given enough time to prove my case since such documents were only obtainable in the Dominican Republic, I ask you to reconsider the decision made in terminating me." (Id. ) Ricketts upheld the determination, relying on Nieves' admission that Cesar was an ineligible traveler. (ECF No. 44-17 at PageID.427 ("When you have people that are not listed properly and they travel, like the stepdad he has listed as his father when technically he wasn't a stepdad, those are terminable-those cases are termination.").)
*968 II. Procedural Posture
Nieves sued Envoy and American Airlines based on his termination on November 18, 2016. Nieves has since voluntarily dismissed American Airlines from the action. (ECF No. 41.) Nieves brings three claims against Envoy: (1) violating the Family and Medical Leave Act by terminating him in retaliation for using FMLA leave; (2) violating the Michigan Persons with Disabilities Civil Rights Act (PWDCRA) by terminating him on the basis of his disability; and (3) violating the Elliot-Larsen Civil Rights Act (ELCRA) by terminating him based on impermissible consideration of his race or ethnicity. Envoy now moves for summary judgment.
III. Standard of Review
Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) ; Tucker v. Tennessee , 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Bennett v. City of Eastpointe , 410 F.3d 810, 817 (6th Cir. 2005) (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e) ; Matsushita , 475 U.S. at 586, 106 S.Ct. 1348. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson , 477 U.S. at 251-252, 106 S.Ct. 2505. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Resolution Trust Corp. v. Myers , 9 F.3d 1548 (6th Cir. 1993) (citing Anderson , 477 U.S. at 249, 106 S.Ct. 2505 ).
However, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Amini v. Oberlin College , 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. Daniels v. Woodside , 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting Anderson , 477 U.S. at 252, 106 S.Ct. 2505 ). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." Pack v. Damon Corp. , 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).
In other words, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." Fogerty v. MGM Group Holdings Corp., Inc. , 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope *969 that a jury may disbelieve factually uncontested proof." Id. at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Daniels , 396 F.3d at 735.
IV. Discussion
a. Nieves cannot establish that his FMLA Leave and subsequent discharge were causally connected
The FMLA entitles an eligible employee to a total of 12 weeks leave per year "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of their position. 29 U.S.C. § 2612(a)(1)(D). The Act prohibits employers from interfering with an employee's use of FMLA leave or retaliating against an employee who exercises her rights under the Act, and it provides a private cause of action to employees to vindicate violations. 29 U.S.C. § 2615 ; Seeger v. Cincinnati Bell Tel. Co. , 681 F.3d 274, 282 (6th Cir. 2012). This case involves retaliation for taking FMLA leave.
Retaliation cases can be proven through direct or indirect evidence. In cases involving indirect evidence, as here, the familiar McDonnell-Douglas burden-shifting framework applies. Seeger , 681 F.3d at 283. The employee must first establish a prima facie case of FMLA retaliation by a preponderance of the evidence. Id. (citing Donald v. Sybra, Inc. , 667 F.3d 757, 762 (6th Cir. 2012).
To pass this first hurdle, Nieves must show that (1) he availed himself of a protected right under of the FMLA by notifying his employer of his intent to take leave; (2) his employer had knowledge of the intent to take leave; (3) he suffered an adverse employment action; and (4) there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action. Id. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." Id. (quoting Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).
Once Nieves establishes a prima facie case, the burden shifts back to Envoy to articulate a legitimate, nondiscriminatory reason for terminating Nieves. Seeger , 681 F.3d at 283-84. If Envoy successfully does so, Nieves may still prove his FMLA claim by proving that Envoy's justification was unlawful pretext for discrimination.[2] Id. at 285.
Envoy attacks Nieves' prima facie case by asserting that he has not put forth enough credible evidence for the Court to discern a causal connection between Nieves' FMLA leave and his termination. The other elements of a prima facie case are not disputed. In response, Nieves claims to have presented "overwhelming evidence" of a causal connection.
Nieves claims that the temporal proximity between his return from FMLA leave and termination show a causal connection. Mickey v. Zeidler Tool & Die Co. , 516 F.3d 516 (6th Cir.2008). In Mickey , the Sixth Circuit held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to *970 constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Id. at 525. However, as Envoy notes, the correct lens for viewing temporal proximity is the time between when the employer learns of the protected activity and the date of termination. See id. Accordingly, the timeframe at issue here is January 5, 2016-when Envoy learned of Nieves' kidney problems and need for FMLA leave-to his termination on March 30, 2016.
This timeframe does not help the Court to deduce a causal connection, especially since the process leading to Nieves termination had been in motion since April of 2015-the audit of Nieves' use of travel privileges. While Nieves emphasizes that Envoy "revived a long-dead audit," nothing in the record indicates anything other than an HR department with a backlog of audits to complete. Chicone's testimony that an audit is usually completed in three months is likewise unhelpful, because she also explained that there was no firm timeframe and that it was "at the discretion of the respective HR business partner." (ECF No. 45-13 at PageID.639.) Further, at the time Ingalls was arranging for Nieves' audit in January of 2016, there were seven other employees who still had outstanding audits. (ECF No. 44-5 at PageID.199-200.)
Therefore, the present case is easily distinguishable from Nieves' cited case, DeBoer v. Musashi , 124 Fed.Appx. 387, 390 (6th Cir. 2005). There, the plaintiff was demoted a single day after requesting FMLA paperwork. The Sixth Circuit concluded that she had met the nexus requirement, even though her employer argued that the decision to terminate her had occurred two weeks before she requested FMLA paperwork. Id. Here, the decision to audit Nieves was made nearly nine months before he needed to take FMLA leave. The decision to terminate him was made nearly three months after Envoy was aware of Nieves' FMLA leave. The catalyst for Envoy's termination of Nieves' employment was the interview with Ingalls, and Nieves' subsequent failure to provide the necessary documentation to prove that he had not abused his travel privileges. Accordingly, his termination on March 30, 2016 does not provide the same temporal proximity or "suspicious timing" that supported a prima facie case in DeBoer .
Instead, the temporal proximity argument in this case is closer to Bush v. Compass Group USA, Inc. , 683 Fed.Appx. 440 (6th Cir. 2017). There, an employer decided that an employee must either find a new position within the company in the next six to eight weeks, or he would be discharged. However, four days after the decision was made and before the employee was informed of the ultimatum, the employee went on FMLA leave. Id. at 453. He was discharged about one month after returning from FMLA leave and file suit claiming, among other things, FMLA retaliation. Id. The Sixth Circuit decided that the employee could not meet his prima facie case for establishing FMLA retaliation based on temporal proximity because the conditional decision to terminate him had been made prior to the FMLA leave. Id. Thus, the court concluded that the district court did not err by granting summary judgment because the employee had not put forward evidence that he was fired for exercising his FMLA rights. Id.
In both Bush and the instant case, a conditional decision was made to terminate an employee-the employer in Bush planned to discharge the employee if he could not find a new position in the company, and Nieves would be discharged if the travel audit revealed that ineligible persons had traveled, pursuant to American and Envoy policy. In other words, the *971 gears turning towards termination began before any FMLA-protected activity was even on the horizon. Accordingly, the individual facts of the case lead the Court to the conclusion that the temporal proximity between Nieves' FMLA leave and his termination is not evidence that he was terminated for using FMLA leave. See Donald v. Sybra , 667 F.3d 757, 763 (6th Cir. 2012) (concluding that plaintiff could not rely on temporal proximity when she was subject of an investigation before going on FMLA leave, and the investigation resulted in termination on her first day back from leave).
In Bush , the employee only asserted temporal proximity in support of his prima facie case. Nieves offers a number of other rationales connecting his termination with his FMLA leave.
He highlights Ingalls' calendar entry, documenting him as a "frequent FML" user. Without any context, this might support Nieves' position. However, the entry-written by Ingalls to herself, and unseen by any other decision maker-is not evidence that would allow the Court to deduce that Nieves was retaliated against for using FMLA leave. It is clear from the record that Ingalls was attempting to arrange for an interview with Nieves relating to the travel audit, after Starcer emailed her and encouraged her to complete her share of the remaining 2015 audits. Ingalls testified to that effect. (ECF No. 46-9 at PageID.832 ("If I would have looked in his time and attendance and saw a lot of FMLs or [shift swaps], then I would have noted this because we are still trying to make sure when he would be available.").) Documenting that an employee has been unavailable on FMLA leave-when trying to schedule an interview for an ongoing investigation-does not help a court deduce that an FMLA leave was causally connected to a subsequent termination.
Nieves also claims that upon his return, Felkey took "the position that ... [Nieves] was sick and it was therefore time for him to retire, revealing his attitude that Nieves was damaged goods." (ECF No. 45 at PageID.501.) Felkey allegedly told Vargas that Nieves should retire and, on another occasion, asked Vargas how "that old man" was doing. (ECF No. 44 at PageID.374.) Even assuming Felkey made these two remarks, "isolated and ambiguous comments are too abstract ... to support a finding" of unlawful discrimination. Parkhurst v. American Healthways Services, LLC , 700 Fed.Appx. 445, 450 (6th Cir. 2017) (quoting Phelps v. Yale Sec., Inc. , 986 F.2d 1020, 1025 (6th Cir. 1993) ; see also Curry v. Brown , 607 Fed.Appx. 519, 523 (6th Cir. 2015) (concluding that supervisor's statement that employee "should probably focus on her health problems rather than worry about the stress of supervising people" did not support an inference that employee's FMLA leave caused her demotion or transfer); Clark v. Walgreen Co., 424 Fed.Appx. 467, 472 (6th Cir. 2011) (concluding that supervisor's remark "because of your health, we're just going to go ahead and terminate you" did not compel conclusion that the plaintiff was fired for taking FMLA leave).
There is a further disagreement as to Felkey's participation in the decision to terminate Nieves. Felkey says that his only role in the termination process was to forward the offboarding packet to the off-boarding committee, and then to sign off on the final termination letter, long after a decision had been reached. (ECF No. 44-1; 44-3.) Felkey also declared that he has never attempted to override a disciplinary decision made by the HR department in ten years at Envoy. (ECF No. 44-1 at PageID.161.)
However, in Envoy's answers to interrogatories, it listed Felkey as having "substantively *972 participated" in the decision to discharge Nieves.[3] (ECF No. 45-3 at PageID.524.) Ingalls email to Starcer and Duque asks whether she should "convince" Felkey to terminate Nieves or investigate further. (ECF No. 44-9 at PageID.213.) Accordingly, there is an issue of material fact is to Felkey's involvement in the termination process.
Ultimately, even if Felkey play some role in the decision to terminate Nieves, the referenced comments are too isolated and ambiguous to significantly aid Nieves in establishing that the decision to discharge him was related to his FMLA leave.
Nieves also says that the "heightened, if not outright absurd" scrutiny of his travel list-including travelers that had been deleted-raises an inference of a causal connection. He notes that the initial notice of the audit referenced only his children or dependents-not parents or other travelers but was later "expanded" to include the entirety of his travel privileges list.
Nieves analogizes to Hamilton v. General Electric Company to support his theory that increased scrutiny may establish a causal connection. 556 F.3d 428 (6th Cir. 2009) In Hamilton , an employee testified that, after he filed an EEOC complaint against the company, he was subject to significantly increased scrutiny from his supervisors before he was discharged. Id. at 435. However, Nieves' assertion that he was subject to heightened scrutiny during the travel audit is not supported by the record. Chicone testified that Nieves' travel list was initially flagged for an audit because of the "volume of added and deleted travelers." (ECF No. 45-13 at PageID.637.) No evidence in the record suggests that the company practices relating to travel audits exclude deleted travelers-doing so would defy the basic purpose of conducting the audit. The company's position is that any abuse of the travel privilege policy is a terminable offense, without reference to whether the offender is currently listed on a travel list or was in the past. (ECF No. 45-20.) Accordingly, there is no evidence that Nieves was subjected to more than the ordinary inquiry that accompanies a travel audit within the company.
Finally, Nieves says that the negative treatment he experienced-like being chosen to work below-wing more often that his peers-is evidence of FMLA retaliation. This allegation does not aid Nieves' case because Nieves does not allege that this negative treatment began after he took FMLA leave. In fact, Nieves was granted the transfer to the baggage services department that he requested after he returned.
Accordingly, the Court finds that Nieves has failed to generate the evidence necessary to support his prima facie case of FMLA retaliation, because, even in the light most favorable to him, he has not demonstrated that his FMLA leave was causally connected to the termination of his employment.
b. Nieves cannot meet his evidentiary burden to satisfy a prima facie case under the Michigan Persons with Disabilities Civil Rights Act
In addition to claiming that he was retaliated against for taking FMLA leave, Nieves claims to have been discharged because of his kidney condition. This claim is also evaluated under the McDonnell-Douglas test. First, the plaintiff must establish a prima facie case of discrimination by presenting evidence that:
*973 (1) she is disabled as defined by the act or that the defendant regarded her as disabled; (2) the alleged disability is unrelated to her ability to perform the job; and (3) she was discriminated against in one of the ways described by the statute, such as being discharged because of a disability. Lown v. JJ Eaton Place , 235 235 Mich.App. 721, 598 N.W.2d 633, 636 (1999) ; Chiles v. Machine Shop, Inc. , 238 Mich.App. 462, 606 N.W.2d 398, 405-06 (1999).
There are two issues at the initial stage, where the burden is on Nieves to establish a prima facie case of discrimination. Envoy argues that it is entitled to summary judgment because Nieves is not disabled under the meaning of the act and second, even if Nieves is disabled, he has not met his burden by putting forth evidence that he was discharged because of his disability.
The PWDCRA defines "disability" as:
(i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic: (A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion. M.C.L § 37.1103(d).
Envoy contends that Nieves was not disabled or regarded as disabled when he returned from his FMLA leave. Nieves responds that his kidney impairment substantially limited a major bodily function, namely, his body's ability to eliminate waste from his blood. (ECF No. 45 at PageID.504.) Nieves also argues that he is not required to prove that his condition impairs a major life activity. (ECF No. 45 at PageID.504.) This is incorrect because his disability claim is premised on Michigan law, rather than the Americans with Disabilities Act. See, e.g. , Judge v. Landscape Forms, Inc. , No. 1-12-cv-1117, 2014 WL 12502685, at *5 (W.D. Mich. Mar. 6, 2014) (concluding that summary judgment was warranted on plaintiff's PWDCRA claims but not his federal ADA claims because he had not shown that his disability substantially limited one or more life activity-as required under Michigan law). Accordingly, Nieves must establish that his kidney impairment substantially limits a major life activity.
However, Nieves also candidly testified at his deposition that he did not consider himself disabled. (ECF No. 44-13 at PageID.340.) This is not dispositive to the legal question, but the Court has difficulty conceiving of a situation in which a person would not consider themselves disabled when one or more of their major life activities is substantially limited. Here, the Court concludes that kidney conditions that severely impair the body's ability to ability to eliminate waste, even if they do not necessarily require dialysis, could constitute a disability. See Arroyo-Ruiz v. Triple-S Management Group , 206 F.Supp.3d 701, 711 (D.P.R. 2016) (concluding that employee who alleged kidneys were not functioning properly and required dialysis could survive a motion to dismiss on ADA claim). There is a genuine issue of material fact as to whether Nieves' condition actually qualifies as such a disability by substantially limiting his ability to process waste, so Envoy cannot prevail on summary judgment by arguing that Nieves was not disabled.
However, Nieves has not shown that a genuine issue of fact exists that his disability contributed to Envoy's decision to terminate him. Nieves never informed Envoy of any of his limitations stemming from his kidney condition. Further, isolated, ambiguous comments made by Felkey that Nieves was "sick" or *974 "should retire" are insufficient to meet the evidentiary burden because they could be made out of concern for Nieves' health. Parkhurst , 700 Fed.Appx. at 450. Felkey's additional comment that "if you can't perform the duty, you don't belong here" likewise does not support an inference that Nieves' alleged disability was a factor in his termination because it was made to a group of employees shortly after Felkey began at GRR-approximately one year before Nieves' condition began. (ECF No. 44-13 at PageID.337.) Accordingly, Nieves has not satisfied the requirements for a prima facie case of disability discrimination under the PWDCRA.
c. Nieves' race discrimination claim fails because he was not replaced by someone outside the protected class, and he has not provided evidence of disparate treatment
In addition to alleging FMLA retaliation and disability discrimination, Nieves alleges race discrimination under the Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101, et seq. Claims alleging race discrimination under the ECLRA are "analyzed under the same evidentiary framework" as Title VII claims, meaning that the Court must once again apply the McDonnell-Douglas framework. Todd v. RBS Citizens, N.A. , 483 Fed.Appx. 76, 81 (6th Cir. 2012) (quoting In re Rodriguez , 487 F.3d 1001, 1007 (6th Cir.2007) ). Nieves must first demonstrate a prima facie case by showing that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for his position; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Sniecinski v. Blue Cross & Blue Shield , 469 Mich. 124, 666 N.W.2d 186, 193 (2003).
Once again, the last element poses the toughest challenge. Envoy claims that Nieves has shown neither that he was replaced by someone outside the class, nor that he was subjected to disparate treatment compared to members outside the protected class so that no inference of discrimination can be made. Nieves responds that he does not need to show that he was "replaced" and instead has made his prima facie case by producing evidence of disparate treatment from which an inference of discrimination can be drawn.
Nieves says a number of different incidents support an inference that his race or ethnicity were factors in his termination. He alleges "numerous rude, disparaging and hostile remarks and difference in treatment by Envoy management ... including mocking his accent and English." [ECF No. 45 at PageID.506.) He says that Felkey and Ingalls "have only investigated and terminated two employees, both Hispanic, for alleged travel abuse" and that Felkey has only fired four employees at GRR-all minorities. (Id. ) As additional support, Nieves notes that he was often directed to work "less desirable" jobs while Caucasian peers were idle. (Id. )
Some of Nieves' assertions are false, some are irrelevant, and some do support his claim. First, the record does not support Nieves' claims that Felkey and Ingalls had only investigated and terminated two Hispanic employees for travel abuses. Felkey was able to name two employees at his deposition, but he also stated that "there have been several." (ECF No. 45-7 at PageID.595.) Felkey stated in a supplemental declaration that he has been involved in the termination of 34 employees at GRR-more than half Caucasian. (ECF No. 46-1 at PageID.758.) As for Ingalls, she testified in her deposition that she had been involved in other travel abuse investigations, that more than 20 employees were included in the same audit as Nieves, and that she had been personally responsible for several of them. (ECF No. 44-15 at *975 PageID.394.) Accordingly, these assertions cannot support any claim by Nieves.
Nieves also alleges objectionable statements and conduct by supervisors including Felkey, Rebecca Grammatico, and Kyle Klausner. Grammatico and Klausner had no input in a decision to terminate Nieves, so evidence that they disparaged Nieves for the way he speaks or other traits tied to his national origin or ethnicity will not generally support a claim under the ELCRA. See, e.g. , Clack v. Rock-Tenn Co. , 304 Fed.Appx. 399, 405 (6th Cir. 2008) (concluding that "statements or conduct of non-decisionmakers are irrelevant to race discrimination claims under Title VII unless they can be imputed to the ultimate decisionmaker") (quoting Noble v. Brinker Int'l. Inc. , 391 F.3d 715, 724 (6th Cir. 2004). Therefore, these allegations are irrelevant to Nieves' claim.
However, "[i]f the comments were made by a person in a position to influence the alleged employment decision, they will be relevant unless they are so isolated and ambiguous as to be nonprobative." Hopkins v. Electronic Data Sys. Corp. , 196 F.3d 655, 665 (6th Cir.1999). Accordingly, Felkey's objectionable conduct and comments could support a claim under the ELCRA because there is at least a genuine issue of fact as to his influence over the employment decision. Nieves asserts that Felkey "blew up" at Vargas when she questioned why Nieves was being investigated for travel fraud and when other Envoy employees openly bragged about selling their buddy passes.[4] (ECF No. 45-6 at PageID.575-76.) Vargas did not identify who these employees were or provide Felkey with any other evidence of the alleged travel privilege abuses. Nieves also claims that another Hispanic employee, Genesis Sosa was discharged for abusing travel privileges as part of an elaborate "set up." (See ECF No. 45-4.) Between these allegations, Nieves can satisfy the minimal burden required at the prima facie stage. Felkey's alleged mocking of Nieves' accent, ignoring claims that other employees were abusing their travel privileges, and requiring Nieves to perform less desirable work than his Caucasian coworkers lead the Court to deduce that Nieves may have suffered from disparate treatment.
d. Envoy has proffered a legitimate, nondiscriminatory reason for terminating Nieves
Envoy clearly articulated the reason for terminating Nieves. He was, by all accounts, a model employee, but the 2015 travel audit and subsequent investigation revealed that his mother's boyfriend, Daniel Cesar was improperly included on his travel list. Additionally, Nieves did not provide documentation for Carlos Martinez, Denys Martinez or Arnaldo Melo; another grounds for termination. This justification was supported by Envoy's progressive discipline policy (referred to as the "Matrix" by Envoy and American employees). The Matrix states that the first abuse of travel privileges is grounds for termination. (ECF No. 45-20.) The reasoning remained consistent as Ingalls made an initial recommendation, Starcer and Duque concurred, Felkey forwarded the recommendation on to the Committee, the Committee concurred, and Ricketts upheld the termination on appeal. (ECF Nos. 44-10; 44-15 at PageID.397-98; 44-17 at PageID.427.) Based on this, the proffered reason was legitimate and nondiscriminatory.
*976 e. Nieves is unable to demonstrate that Envoy's proffered reason was prextext
A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. Dews v. A.B. Dick Co. , 231 F.3d 1016, 1021 (6th Cir. 2000). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him." Clark , 424 Fed.Appx. at 474 (citation and internal quotation marks omitted).
Nieves argues forcefully that "compelling evidence of pretext exists." The Court does not agree. Nieves says the evidence of pretext includes: (1) the absence of a single truly comparable employee who was fired under similar circumstances; (2) the fact that Envoy did not question Nieves about the travel audit between the time he turned in the documentation for himself, Sahara and Sharina in June of 2015 until the "ambush meeting" on March 9, 2016; (3) "the resurrected audit"; (4) Envoy revoking Nieves' travel privileges before he was able to travel to the Dominican Republic to obtain documents for Denys Martinez or Arnaldo Melo; (5) Felkey's supposed disregard for complaints from Sahara that other people at Envoy openly bragged about using their travel privileges for illicit gain; and (6) Felkey's alleged discriminatory remarks. (ECF No. 45 at PageID.502, 506.)
Even in the light most favorable to Nieves, this evidence is insufficient to support a claim of pretext. First, his contention that Envoy has not fired an employee under similar circumstance is belied by the record. Sensing this, he argues that Genesis Sosa was fired under circumstances "strongly suggest[ive]" of a set-up by Envoy management. (ECF No 45 at PageID.502.) However, Sosa was fired for falsely claiming that she had legal guardianship of her sister and nephew, and also falsely listing her boyfriend, who did not meet Envoy requirements for travel privileges. (See ECF No. 46-2.) Nieves claims that Sosa was "set-up" because Klausner insisted that they use travel privileges rather than drive, when attending a family funeral. (ECF No. 45-4.) However, this was not the only time that Sosa's boyfriend used travel privileges. (Id. at PageID.764.) Moreover, there is no indicia of a "set-up"-Sosa had represented that all three of her travelling companions were eligible, and there is no indication in the record that Klausner knew that Sosa was travelling with ineligible travelers or otherwise abusing her travel privileges when he encouraged Sosa to take advantage of the travel privileges. Accordingly, Sosa's termination actually supports Envoy's position, contrary to Nieves' claims.
Second, as has been discussed supra , the gap between Nieves turning in his paperwork in the Summer of 2015 and the interview in 2016 is not evidence of any ulterior motive or an indication that something nefarious was afoot. In hindsight, Ingalls probably could have moved the travel audit process along more quickly, but Nieves was not the only employee included in the Second Quarter 2015 audit that remained pending into January of 2016. This also negates Nieves' "resurrected audit" theory-the audit was slow, certainly, but no evidence in the record suggests that it was closed or abandoned.
Next, Envoy's revocation of Nieves' travel privileges is not evidence that the decision to terminate him was pretextual. Nieves' theory is that this prevented him from going to the Dominican Republic to obtain proof that he was the legal guardian to Denys and Arnaldo. There is nothing to *977 suggest that proof actually existed there. It would not have cured the issues relating to Daniel Cesar. Additionally, Vargas had her own travel privileges and could have flown to the Dominican Republic to obtain the documents. To date, nothing has been provided to the Court that would suggest that Nieves and Vargas ever actually had legally-recognized guardianship of Arnaldo or Denys other than their own testimony or that a trip to the Dominican Republic would have resulted Nieves obtaining documents to prove his legal guardianship of them. Finally, there is no evidence that Ingalls deviated from any Envoy policy by freezing Nieves' travel privileges while he was under investigation. Because of all of this, no reasonable jury could conclude that freezing Nieves' travel privileges was evidence of an intent to generate a pretextual reason for terminating him.
Sahara testified that she told Felkey that employees openly bragged about selling their travel privileges (buddy passes) for a profit. However, Nieves has not explained what actually Felkey was supposed to do with unsubstantiated hearsay that some other, unnamed employees were abusing travel privileges. By the time Vargas had this conversation with Felkey, Ingalls had already interviewed him, and the review process leading to his termination was largely out of Felkey's hands. Ingalls testified that Felkey could not have altered the outcome if he had tried. (ECF No. 44-15 at PageID.406.) Ultimately, when viewing Felkey's minor role in the decision to terminate Nieves, and because Nieves has not demonstrated that any other decision-maker was aware of these allegations, this is unable to create a genuine issue of fact pertaining to pretext.
Finally, the allegations that Felkey mocked Nieves' English are insufficient to create an issue of fact relating to pretext. Nieves contends that Felkey sometimes "[made] a little laugh" and asked him to repeat something he said because his accent was difficult to understand. (ECF No. 44-13 at PageID.345.) However, Nieves also stated in his deposition that Felkey never made any comments that made Nieves feel as if he was hostile to Hispanic people. (Id. at PageID.335.) Accordingly, the evidence does not support Nieves allegations that the travel audit was a pretextual ruse designed to cover for Envoy and Felkey's desire to treat Nieves, as a Hispanic man, differently than other employees. Cf. In Re Rodriguez , 487 F.3d 1001, 1005-06 (6th Cir. 2007) (concluding that plaintiff had valid race discrimination claim where manager testified that supervisor said he would not promote Hispanic employees because of their accents).
Envoy's decision to terminate Nieves is further buttressed by the honest belief rule. A plaintiff is required to show "more than a dispute over the facts upon which the discharge was based." Braithwaite v. Timken Co. , 258 F.3d 488, 493-94 (6th Cir. 2001). An employer's decision-making process is not required to "be optimal or [leave] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Smith v. Chrysler Corp. , 155 F.3d 799, 807 (6th Cir. 1998). As long as the employer held an honest belief in its proffered reason, "the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." Smith , 155 F.3d at 806 ; see also Majewski v. Automatic Data Processing, Inc. , 274 F.3d 1106, 1117 (6th Cir. 2001).
The record here indicates that every level of Envoy's decision makers, beginning with Ingalls and continuing to Starcer, Duque, the discharge committee and Greg Ricketts held an honest and reasonably-informed belief that Nieves violated *978 Envoy's travel privileges policy by listing Arnaldo Melo, Denys Martinez, Daniel Caesar, and Carlos Martinez. Nieves did not provide documentation for Carlos Martinez until after he was terminated. He also admitted that Daniel Caesar was improperly included on his travel list when appealing the termination decision to Ricketts. In fact, Ricketts concluded that his decision to uphold the termination was simplified by Nieves' admission, because even a single ineligible traveler is grounds for discharge. Nieves never mentioned that he only listed Denys, Arnaldo, and Daniel Caesar at the request of one of his former supervisors-as he now maintains. Therefore, this theory will not support him because it was not raised with any of the decision makers that influenced the decision to terminate his employment. Accordingly, Nieves has not set forth evidence that Envoy's proffered reason for terminating his employment was pretextual. This is fatal to his ELCRA claim, and it would be fatal to both his PWCRA and FMLA claims, had he been able to make a prima facie case.
V. Conclusion
In sum, the Court will grant Envoy's summary judgment motion because even in the light most favorable to Nieves, he is unable to rebut Envoy's legitimate and nondiscriminatory rationale for terminating his employment.
ORDER
For the reasons contained in the accompanying Opinion, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No 43).
IT IS FURTHER ORDERED that Plaintiff's complaint be DISMISSED WITH PREJUDICE .
JUDGMENT TO ENTER SEPARATELY.
IT IS SO ORDERED .
JUDGMENT
In accordance with the Opinion and Order entered on this date (ECF No. 47) and pursuant to Federal Rule of Civil Procedure 58, judgment hereby enters.

"CSO" is Envoy-speak for swapping shifts with another employee.

This framework also applies to Nieves' other claims, so the Court will begin by addressing whether Nieves has met his burden by establishing a prima facie case on any of his FMLA, disability discrimination or race discrimination claims.

Nieves incorrectly states that the Envoy admitted Felkey "substantially participated" in the decision to discharge him. (ECF No. 45 at PageID.496.) Substantive and substantial are not interchangeable.

Buddy passes are another form of travel privilege, in which Envoy employees are allotted a certain number of passes to be used by their friends and other family members to fly at a reduced charge.